**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. _____**


MASTEC RENEWABLES PUERTO RICO,
LLC,

      Plaintiff,

                                                **JURY DEMAND**

v.

MAMMOTH ENERGY SERVICES, INC. and
COBRA ACQUISITIONS, LLC,

      Defendants.

_____/


**<u>COMPLAINT</u>**

## TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................................................... ii

INTRODUCTION ............................................................................................................... 1

PARTIES AND RELEVANT NONPARTIES ....................................................................... 3

    Plaintiff ........................................................................................................................ 3

    Defendants ..................................................................................................................... 4

    Relevant Nonparties ...................................................................................................... 5

JURISDICTION AND VENUE .......................................................................................... 6

FACTUAL ALLEGATIONS .............................................................................................. 7

    Cobra Monopolizes PREPA's Initial Emergency Response ......................................... 8

    PREPA Issues an RFP to Rebuild and Restore Puerto Rico's Grid .............................. 9

    PREPA Engages Cobra and MasTec and Executes Master Service Contracts ........... 11

    MasTec Mobilizes to Provide Critical Assistance in Puerto Rico .............................. 12

    PREPA Inexplicably Suspends MasTec's Work ........................................................ 13

    Tribble Orchestrates FEMA's Rejection of All RFP Work Assigned to MasTec ........ 14

    Tribble Conspires with Ellison, Cobra, and Mammoth to Direct All Work to Cobra .. 17

AGENCY, ALTER EGO, AND DIRECT LIABILITY ....................................................... 25

TOLLING OR NON-ACCRUAL OF STATUTES OF LIMITATION ...................................... 28

COUNT I (RICO, 18 U.S.C. § 1962(c)) .......................................................................... 28

COUNT II (RICO, 18 U.S.C. § 1962(d)) ......................................................................... 30

COUNT III (Tortious Interference) ................................................................................. 31

COUNT IV (31 L.P.R.A. § 5141) .................................................................................... 33

DEMAND FOR JURY TRIAL ......................................................................................... 34

Plaintiff MasTec Renewables Puerto Rico, LLC ("MasTec") sues Mammoth Energy Services, Inc. ("Mammoth") and Cobra Acquisitions, LLC ("Cobra"), and states:

## INTRODUCTION

1.      Hurricane Maria made landfall in Puerto Rico as a Category 4 storm on September 20, 2017, wiping out the island's electricity, destroying much of its infrastructure, and ultimately causing the deaths of more than 3,000 residents.  Power was not fully restored to Puerto Rico's electrical grid until April 2019, despite the Federal Emergency Management Administration's ("FEMA") immediate allocation of hundreds of millions of dollars to emergency restoration efforts.  The restoration of power to Puerto Rico was delayed because Ahsha Tribble, the FEMA administrator responsible for assigning restoration and repair projects on the island, accepted bribes to direct work exclusively to Cobra.

2.       Cobra, a wholly owned and newly formed subsidiary of Mammoth, had virtually no experience with large scale electric infrastructure restoration, disaster cleanup, or emergency response.  Inexplicably, Cobra was selected over MasTec — a renowned and well-respected complex infrastructure contractor with more than fifty years of relevant experience — to perform *all* emergency electrical work funded by FEMA in the immediate aftermath of the storm.  Cobra's initial contract for emergency services was valued at $200 million. Over time its maximum compensation under that contract increased to $945 million.

3.      In February 2018, the Puerto Rico Electric Power Authority, commonly referred to as PREPA, issued a request for proposals for contracts to perform additional electric restoration work in Puerto Rico, also funded by FEMA.  At the end of the bidding process, PREPA awarded only two contracts: a $900 million maximum compensation contract to Cobra, and a $500 million maximum compensation contract to MasTec. Together, these contracts covered the $1.4 billion

1

allotted to FEMA for its recovery efforts in Puerto Rico.

4.    MasTec had a contract and was repeatedly assured, including direct personal assurances from Tribble, that assignments that would fully satisfy its $500 million contractual cap were forthcoming. MasTec accordingly initiated a massive mobilization effort, incurring millions of dollars of costs, to position itself to immediately assist the ravaged island in desperate need of repair.

5.    But there would be no work. MasTec received *zero* work arising from its $500 million Master Service Contract.  Instead, all FEMA-funded restoration work on the island was wrongfully diverted to Cobra, which to date has been paid approximately *$1.1 billion* in FEMA funds as a result of the corrupt relationship between Tribble, Cobra, and Mammoth.

6.    The world now knows why:  on September 10, 2019, federal prosecutors indicted Cobra President Donald Keith Ellison and FEMA official Ahsha Nateef Tribble for conspiracy to commit bribery and fraud.  Ellison bribed Tribble to direct work in Puerto Rico to Mammoth and Cobra.

7.    Over the course of at least twelve months, Ellison bribed Tribble with airfare, hotel rooms, a security detail, and the use of his personal credit card in exchange for Tribble's assistance in securing valuable work exclusively for Cobra.

8.    As just one example of many, in June 2018, Ellison secured a lucrative position at Cobra for Jovanda Patterson, Tribble's close friend and colleague at FEMA. Within a week, MasTec received a notice suggesting that its work was temporarily suspended. The day after that notice, Tribble and Ellison were exchanging personal emails about a secret rendezvous at Ellison's hotel.

9.    Before Ellison and Tribble were arrested in September 2019, federal investigators

found images of Ellison's credit card in Tribble's iCloud library, and images of a Cobra competitor's proposed rate schedule in Ellison's iCloud library.

10.    MasTec was not just any other contractor. It was specifically chosen, and received a signed contract, for $500 million of work. MasTec was the direct victim of Cobra's bribery scheme, and sustained hundreds of millions of dollars of losses as a result of Defendants' interference.

11.    MasTec now seeks to recover those losses, and brings claims against Mammoth and Cobra for violations of the federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.* ("RICO"), tortious interference, and violation of section 5141 of Title 31 of the Laws of Puerto Rico Annotated.

<u>**PARTIES AND RELEVANT NONPARTIES**</u>

<u>**The Parties**</u>

<u>**Plaintiff**</u>

12.    Plaintiff MasTec is a limited liability company which was formed and organized under the laws of the Commonwealth of Puerto Rico in September 2010. MasTec's principal place of business is in Coral Gables, Florida.

13.    MasTec is a wholly owned subsidiary of MasTec, Inc., an infrastructure construction company that has grown to become one of the largest Hispanic-owned companies in the United States, with more than 23,000 employees and revenues exceeding $6 billion. MasTec, Inc. subsidiaries, including MasTec, specialize in electrical transmission and distribution, including the emergency restoration of electric power after natural disasters and severe weather events.

14.    MasTec was one of only two contractors immediately awarded a Master Services

3

Contract in response to a request for proposals ("RFP") issued by PREPA for the continued restoration of Puerto Rico's electric transmission and distribution systems after Hurricane Maria. The other contractor was Cobra. After MasTec had mobilized, it received repeated assurances from Tribble and PREPA that its services under contract were urgently needed. Instead, all work assigned to MasTec pursuant to the RFP was rejected by FEMA and redirected to Cobra.

**Defendants**

15.     Defendant Mammoth is incorporated under the laws of the State of Delaware and has its principal place of business in Oklahoma City, Oklahoma. Mammoth is primarily an oil and gas company. It did not enter the energy infrastructure business until the second quarter of 2017, just months before Hurricane Maria, when it formed Cobra Acquisitions, LLC, as a wholly owned subsidiary. With Mammoth's assistance, the newly formed Cobra Acquisitions, LLC, was awarded two contracts to help restore power to Puerto Rico and rebuild its electrical grid: a $200 million Emergency Master Service agreement in October 2017, which was amended five times to increase the contract's value to $945 million; and a second, $900 million contract in response to PREPA's RFP. When Mammoth issued a statement regarding the work performed in Puerto Rico on June 7, 2019, it characterized its role in the restoration project as follows: "Following Hurricane Maria in Puerto Rico and its complete destruction of the island's power grid, Mammoth, through its wholly owned subsidiary Cobra, made a proposal to do reconstruction work to help restore power and rebuild Puerto Rico's grid."

16.     Defendant Cobra is a limited liability company organized under the laws of the State of Delaware and has its principal place of business in Oklahoma City, Oklahoma. Cobra is a wholly owned subsidiary of Mammoth formed in the second quarter of 2017, just months before PREPA engaged the company to assist with emergency relief efforts after Hurricane Maria.

4

**Relevant Nonparties**

17.      Donald Keith Ellison was the President of Cobra at all times relevant to the events described herein.  As alleged below, Ellison purchased hotel rooms, meals, airfare, and other inducements for Ahsha Nateef Tribble in order to secure contracts and lucrative project assignments for Mammoth and Cobra, to MasTec's detriment.

18.      Tribble was the Deputy Regional Administrator for FEMA Region II, which serves the states of New Jersey and New York, the Commonwealth of Puerto Rico, the Territory of the U.S. Virgin Islands, and eight Tribal Nations.  From around October 2017 to September 2018, Tribble was FEMA's Sector Lead for Power and Infrastructure in Puerto Rico and part of FEMA's response to Hurricane Maria.  She was also designated as Recovery Office Deputy Director – Infrastructure Directorate/Disaster Recovery Manager in the Office of the FEMA Federal Coordinating Officer in Puerto Rico during this period.  Tribble accepted bribes from Ellison, in the form of hotel rooms, meals, airfare, and other inducements, and in return secured contracts for, and directed work to, Mammoth and Cobra at MasTec's expense.

19.      PREPA is an electric power company owned and operated by the government of Puerto Rico.  PREPA is responsible for electricity generation, power distribution, and power generation on the island, and is the sole provider of electricity for approximately 1.5 million residential, commercial, and industrial clients in Puerto Rico.  PREPA entered into Master Service Contracts with MasTec and Cobra. It was prepared to assign work to both contractors, but was pressured and misled by Tribble, in coordination with Ellison, Cobra, and Mammoth, into directing all of the assignments to Cobra.

5

## JURISDICTION AND VENUE

20.     This Court has jurisdiction under 28 U.S.C. § 1331 because Plaintiff's RICO claim arises under the law of the United States.  This Court also has jurisdiction under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and there exists complete diversity of citizenship between Plaintiff and Defendants.

21.     This Court has personal jurisdiction over Mammoth and Cobra because the federal RICO statute, at 18 U.S.C. § 1965(d), provides for nationwide service of process, and thus also provides a statutory basis for jurisdiction.  *See Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 942 (11th Cir. 1997).  Mammoth and Cobra are domestic corporations having sufficient aggregate contacts with the United States to confer jurisdiction on this Court, and litigating in this District would not infringe on Mammoth's or Cobra's liberty interests or present a "constitutionally significant inconvenience." *Id.* at 947.

22.     The Court has pendent personal jurisdiction over Plaintiff's state law claims because they arise from the same nucleus of operative facts as the RICO claim.  The Court also has personal jurisdiction over these claims under Florida's long-arm statute, Fla. Stat. § 48.193(1)(a)(2), because Mammoth and Cobra committed tortious acts in this state, and tortious acts outside of the state which caused injury in Florida.  In addition, (1) Plaintiff's claims arise from, or relate to, at least one of the Mammoth and Cobra contacts with Florida; (2) Mammoth and Cobra purposefully availed themselves of the privilege of conducting activities in Florida; and (3) the Court's exercise of personal jurisdiction here comports with traditional notions of fair play and substantial justice.

23.     Venue is proper in this forum pursuant to 28 U.S.C. § 1391(b)(1) and (c)(2) because Defendants are subject to personal jurisdiction in this District, and therefore reside here for

purposes of the venue statute.  Venue is also proper in this forum pursuant to 28 U.S.C. § 1391 because Defendants transact business, engaged in misconduct, and/or may be found in this District.

24.     All conditions precedent to this action have occurred, been performed, or have been waived.

**FACTUAL ALLEGATIONS**

25.     Hurricane Maria made landfall on the island of Puerto Rico on September 20, 2017, as a Category 4 storm.  As Maria approached, the citizens of Puerto Rico were still recovering from the destruction wrought by Hurricane Irma, which had passed near San Juan two weeks earlier leaving approximately two-thirds of the island without electricity.[1]  With sustained 155-mph winds, Maria destroyed what was left of Puerto Rico's electrical grid after Irma, leaving all residents of the island completely without power, and precipitating the largest blackout in U.S. history.[2]

26.     On the day Maria made landfall, President Trump issued a major disaster declaration for Puerto Rico, designated FEMA-4339-DR, authorizing FEMA to allocate such available disaster relief funds as were necessary to provide disaster assistance to Puerto Rico and cover related administrative expenses.  In the aftermath of the storm, PREPA triggered an emergency protocol and began the search for private contractors to immediately begin work to restore power to the island.  Months later, PREPA would issue an RFP seeking competitive bids from electric contractors to rebuild and restore Puerto Rico's electric grid.

---

[1] Michon, Scott, *Hurricane Maria's Devastation of Puerto Rico*, NOAA Climate.gov (Aug. 1, 2018), available at https://www.climate.gov/news-features/understanding-climate/hurricane-marias-devastation-puerto-rico (last visited January 10, 2020).

[2] *Id.*; Barclay, Eliza, *Hurricane Maria: 4 ways the storm changed Puerto Rico – and the rest of America*, Vox (Sept. 20, 2018), available at https://www.vox.com/2018/9/20/17871330/hurricane-maria-puerto-rico-damage-death-toll-trump (last visited January 10, 2020).

**Cobra Monopolizes PREPA's Initial Emergency Response**

27.     In the immediate aftermath of Maria, MasTec had meetings with PREPA representatives to discuss its potential participation in the emergency restoration efforts.   On October 13, 2017, PREPA notified MasTec that PREPA was considering MasTec as a potential contractor and that MasTec would need to accept an Emergency Master Service Agreement with no changes.

28.     MasTec reviewed PREPA's draft Emergency Master Service Agreement, valued at $200 million, executed it, and returned it to PREPA on October 25, 2017.  This contract was never countersigned.

29.     Meanwhile, Cobra had already positioned itself to monopolize all of Maria's emergency restoration work. On October 19, 2017, within a week of MasTec being notified that it was a potential contractor, PREPA executed its first Emergency Master Services Agreement with Cobra (the "First Cobra Contract").   Cobra was new to large-scale electric infrastructure restoration.  Its parent, Mammoth, an oilfield services and fossil fuel company, had formed Cobra in the second quarter of 2017, just months before Hurricane Maria, as its first foray into the energy infrastructure business.  When Mammoth and Cobra executed the First Cobra Contract, Cobra had scarce experience in disaster cleanup, let alone emergency response. Mammoth's CEO and Director, Arty Straehla, negotiated and executed the First Cobra Contract on Cobra's behalf.

30.     The First Cobra Contract provided for a one-year term and a maximum of $200 million compensation to Cobra, with a $15 million deposit due upon execution.

31.     FEMA reviewed the First Cobra Contract and issued a project worksheet, or "PW," to provide federal assistance for Cobra costs under the Public Assistance Grant Program.  FEMA

approved the PW, designated PW-251, committing $200 million in public funds for Cobra contract costs.

32.    PREPA and Cobra executed several amendments to the First Cobra Contract, all executed on Cobra's behalf by Mammoth's CEO, Arty Straehla. The fourth amendment, executed on January 28, 2018, and made effective as of January 1, 2018, increased Cobra's maximum compensation under the First Cobra Contract from $200 million to $445,429,800.

33.    On February 27, 2018, PREPA and Cobra executed a fifth amendment to the First Cobra Contract, increasing Cobra's maximum compensation from $445,429,800 to $945,429,800. FEMA subsequently amended PW-251 to approve a total of $945,429,800 in grant funds for the First Cobra Contract.  By October 2018, FEMA had reimbursed more than $800 million in Cobra contract costs, and all available emergency restoration work directly approved by FEMA had been awarded to Cobra.

**PREPA Issues an RFP to Rebuild and Restore Puerto Rico's Grid**

34.    On February 16, 2018, PREPA issued an RFP, designated RFP-77844, to "procure the services of one or more Contractors to become part of the scope of immediate restoration of the PREPA system due to the impact of Hurricane Maria."  The RFP was intended to be competitively bid, set a March 2, 2018, deadline for submissions, and identified minimum qualifications for all applicants. Among other things, all applicants were required to have successfully completed "at least one (1) of each type of similar project in the last three years (3) date ending December 31, 2017[,]" and to provide references, including references from utility companies, speaking to that experience.  The three project types, each of which was defined in detail, included (1) transmission line projects; (2) distribution line projects; and (3) substation or switchyard projects.   The RFP was intended to provide PREPA with one year of contractor service.

35.     The RFP also set forth "grading criteria" for all applicants, breaking down the weight to be attributed to each factor in assessing applicant bids.  "Quantitative factors," such as pricing competitiveness, discount proposals, schedule and method descriptions, and mobilization capacity were weighted at 65 percent; while "qualitative factors," such as background and financial information (including audited financial statements for 2015 and 2016), company reputation, and previous experience were weighted at 35 percent.

36.     MasTec submitted its bid package on or before March 2, 2018.  MasTec explained in its proposal that its parent company was founded in Puerto Rico more than fifty years ago, and has grown to become one of the largest Hispanic-owned companies in the United States, with more than 23,000 employees and revenues exceeding $6 billion.  MasTec also described its ongoing and recent work in Puerto Rico, not only as a contractor for AT&T, Sprint, and other private companies, but also as part of the recovery efforts after Hurricane Maria through a contract approved by the United States Army Corps of Engineers.  The proposal further related that, among other things:

- MasTec had been part of every major United States hurricane recovery effort for the past twenty years;

- MasTec crews had just returned from a four-month deployment to Puerto Rico, where they worked alongside PREPA and others in Bayamon, Arecibo, San Juan, and Caguas;

- MasTec proposed a $100 million performance/payment bond, and was capable and willing to provide a much larger bond if required by PREPA; and

- MasTec had considerable experience in Puerto Rico and elsewhere in each of the three project types outlined in the RFP.

37.     MasTec's proposal also disclosed that MasTec would mobilize "immediately upon award" of a contract, deploying equipment, materials, construction supervision, craft labor, and the balance of MasTec's Project Management Team as soon as a contract was executed.

38.     On March 5, 2018, Ahsha Tribble and PREPA's Chief Financial Advisor called Robert Apple, who is MasTec, Inc.'s Chief Operating Officer and MasTec's President, to inform him that MasTec had been shortlisted for a contract.  Tribble also informed Apple that FEMA and PREPA would need multiple contractors to restore Puerto Rico's electric grid.

39.     On March 29, 2018, the evaluation committee designated by PREPA recommended three companies which had submitted proposals to execute contracts with PREPA: Cobra, MasTec, and Foreman Electric Services, Inc. ("Foreman").  PREPA awarded immediate contracts only to Cobra and MasTec.[3]

**PREPA Engages Cobra and MasTec and Executes Master Service Contracts**

40.     Cobra and MasTec executed one-year Master Service Contracts ("MSC") with PREPA on May 26, 2018, and May 29, 2018, respectively.  The Cobra MSC was executed by Arty Straehla, Mammoth's CEO, and Walter Higgins, the CEO and Executive Director of PREPA. Higgins and Apple executed the MasTec MSC.

41.     The Cobra MSC provided that Cobra would provide labor, supervision, tools, equipment, and materials necessary to restore and reconstruct Puerto Rico's electrical grid, in exchange for an amount not to exceed $900 million.  The MasTec MSC included the same provision, with MasTec's consideration capped at $500 million for the one-year contract period. Together, the Cobra and MasTec MSCs covered the $1.4 billion allotted to FEMA for its recovery efforts in Puerto Rico in connection with the RFP.

42.     At or around the dates of execution, FEMA prepared draft PWs for projects to be completed by MasTec and Cobra. The PWs were designated PW-473 and PW-466, respectively.

---

[3] Foreman was not awarded a contract until January 29, 2019 — eight months after Cobra and MasTec executed their Master Service Contracts.

**MasTec Mobilizes to Provide Critical Assistance in Puerto Rico**

43.     As a result of the execution of the MasTec MSC, on June 1, 2018, MasTec began sending equipment to the Port of West Palm Beach, Florida for transport to Puerto Rico.  MasTec mobilized immediately because the situation in Puerto Rico was dire.  Any delay in mobilization would translate to additional delay in restoring power to Puerto Rico, and further danger to the health and safety of the Puerto Rico population.

44.     On June 5, 2018, PREPA sent a formal Notice to Proceed to MasTec, authorizing MasTec to commence work, and requesting 300 line workers to perform transmission and distribution work.  At or around the same time, PREPA representatives told MasTec to be ready to commence work on the island as soon as possible.  In connection with the Notice to Proceed, PREPA also invited MasTec to participate in PREPA's weekly production meetings.

45.     Based on the Notice to Proceed and these representations, MasTec continued to execute its mobilization plan, hiring employees, making capital purchases, purchasing barge capacity and airfare to transport labor and equipment to Puerto Rico, and securing contracts for long-term lodging on the island.  Among other things, MasTec mobilized its executive leadership and key project personnel, with an eye toward establishing critical working and reporting relationships between MasTec and PREPA; reserved 135 hotel rooms for an initial one-month stay at a cost of approximately $610,000[4]; transported necessary equipment, including, but not limited to, 120 bucket trucks, 85 pickup trucks, 600 distribution dollies, 60 diggers, and 46 trailers; and dispatched 300 distribution craft personnel.

46.     MasTec's mobilization costs exceeded $15 million.

---

[4] These reservations were later extended while MasTec awaited assignments, bringing lodging costs alone into the millions.

**PREPA Inexplicably Suspends MasTec's Work**

47.    Unbeknownst to MasTec, as it began to incur millions in mobilization costs, Tribble had been accepting bribes and inducements from Ellison for months.

48.    Ellison had already secured a lucrative position at Cobra for Tribble's close friend at FEMA. On June 1, 2018, the same day that MasTec began sending equipment to West Palm Beach for transport to Puerto Rico, Cobra emailed Tribble's friend, Jovanda Patterson, an "offer letter" for a Business Development position at Cobra Logistics. The annual salary was $160,000 with a bonus opportunity equal to up to 30% of her salary. Patterson's job at FEMA had paid less than $100,000. Tribble had reached out to Ellison on March 22, 2018, about her desire to help Patterson. Ellison immediately told Tribble he would "take care of [Patterson]." Tribble connected Patterson and Ellison by email two days later.

49.    On June 7, 2018 — six days after Patterson's "offer letter" and two days after the Notice to Proceed — PREPA sent a Notice of Suspension of Work to MasTec, ordering MasTec to "suspend any work regarding th[e] Contract, including any mobilization works of materials, personnel or equipment."  The letter offered no reason for the suspension, but suggested that it would be temporary and short-lived, representing that "[t]he new commencement date for the works to be executed under the above referenced Contract will soon be informed."  Shortly after the suspension notice issued, a PREPA representative assured MasTec that the suspension would be brief.

50.    MasTec received its Notice of Suspension on a Thursday. The next day, Tribble and Ellison exchanged emails on their personal accounts about meeting up at Ellison's hotel. Tribble wrote, "Just in case you wanted to know: Monday: I land at noon, have one meeting and then will meet you at your hotel at or before 3:00pm. After dinner I will go to the airport to catch

13

my 10:00pm flight to NY. Tuesday: (in NY for day). I land in DC at 6:45pm. I will come find you for a bit then got [sic] to my hotel. Weds: 0800 flight to SJU Is this good with you?"[5] Ellison responded: "This is very good! Enjoy your day with your mom. Ignore your phone and relax!"

51.     While Ellison was securing a high-paying job for Tribble's friend, and arranging secret hotel meetings, MasTec was trying to proceed with its contracted-for restoration and repair work in Puerto Rico. On June 12, 2018, MasTec's Executive Program Manager, Rick Roton, emailed PREPA to ask for a list of initial transmission and distribution work assignments for MasTec, which had been mentioned in a meeting one week earlier.  Roton explained that MasTec needed the list "to ensure that our crews are appropriately deployed to support [PREPA's] expectations with regard to minimizing travel times to and from the assigned job sites."  PREPA responded that the list was being revised as a result of the suspension, but assured Roton that "once we are sure your contract is properly funded . . . PREPA will be sure your assignments are unique."

52.     MasTec never had any reason to doubt these representations, or to question the motives behind its Notice of Suspension.  Having received further assurances that any delay would be brief and all funding would be secured, MasTec began shipping equipment and supplies to Puerto Rico on June 14, 2018, to position itself to assist in the recovery efforts as quickly as possible.

**Tribble Orchestrates FEMA's Rejection of All RFP Work Assigned to MasTec**

53.     MasTec had no way of knowing that its efforts were futile. In exchange for Ellison's bribes and inducements, Tribble had been working behind the scenes to ensure that all funds

---

[5] SJU is the airport abbreviation code for San Juan Luis Muñoz Marin Airport, the largest airport in Puerto Rico.

available to FEMA for electrical restoration work were, and would always be, directed exclusively to Mammoth and Cobra.

54.     When MasTec representatives arrived in Puerto Rico, Tribble invited them to two meetings to discuss the process for completing and assigning PWs. These meetings convened on July 8 and 10, 2018. Attendees at the meetings included representatives from FEMA, PREPA, MasTec, and Cobra.

55.     Tribble explained that work was to be assigned on a project-by-project basis: PREPA would prepare PWs, setting forth the descriptions and requirements of particular projects, and then forward the PWs to FEMA for approval and the allocation of funding. Once approved by FEMA, PREPA would assign the project to one of the selected contractors.

56.     At the meeting, Tribble crafted a narrative casting the funneling of work to Cobra over MasTec as nothing more than a mix-up. She attributed the mix-up to PREPA's confusion about the process for completing PWs, even though PREPA had completed Cobra's PWs, and successfully submitted them to FEMA for approval, for months.

57.     To assist in resolving this "confusion," on July 11, 2018, Roton emailed PREPA to offer MasTec's assistance in completing the PWs required by FEMA in order to facilitate execution of the restoration work to be assigned to MasTec.

58.     On August 17, 2018, Roton received a report indicating that Cobra had begun work in Arroyo, Puerto Rico. After two months in Puerto Rico, MasTec had still not been assigned any work. When Roton contacted Tribble to ask about the report, she assured him that MasTec would soon be assigned work, assuring Roton that "[w]e (FEMA) have your (MasTec) project that will consume your cap to [San Juan]." She concluded: "I asked Mr. Ortiz (CEO, PREPA) for the release

15

to begin planning and it is caught up in the PREPA machine.  I hope to hear from him tomorrow." Tribble was stalling; MasTec never heard about this project again.

59.     Tribble continued to string MasTec along for months.  On January 11, 2019, Tribble initiated and hosted a meeting among representatives from FEMA, PREPA, and MasTec, to discuss the status of MasTec PW-473 and other related issues.  At the meeting, FEMA attempted to lay blame for MasTec's lack of work at PREPA's feet.  FEMA related to the participants that PW-473 was a "shell" of a PW that had yet to be approved, obligated, or acted upon by PREPA. FEMA attributed the long delay in assigning work to MasTec to PREPA's failure to assign work and submit the necessary information to FEMA to determine initial eligibility and formulate PW-473.  But FEMA was approving work assigned to Cobra without issue at the same time.

60.     During at least two in-person conversations, after PREPA and MasTec executed the MasTec MSC, a PREPA representative told MasTec that PREPA had submitted a PW with MasTec's name, which FEMA rejected. But when the name on the PW was changed to Cobra, FEMA accepted it and assigned the work to Cobra. PREPA complained to MasTec about FEMA's repeated rejections of MasTec's work, and for an explanation could offer only that Tribble wanted to give work to Cobra.

61.     In emails after the January 11, 2019, meeting, FEMA again deflected all blame for the work delays to PREPA.  In an email to Robert Apple dated January 28, 2019, copying Tribble, Thomas Miller, who reported to Tribble, represented as follows:

> FEMA can fund work as it is assigned. The fact remains that PREPA did not assign any work with which FEMA could provide any funding for. MasTec was asked to start work, but then not given any. FEMA has been working for 6 months to get that commitment from PREPA to assign the work, but they did not. FEMA can't fund nothing. It truly is that simple.  I believe the favoritism portion comes from the idea that PREPA is consistent in messaging to MasTec that FEMA is blocking any work assignments, yet you know that other Contractors are getting work assigned. PREPA also messages the same to that Contractor, we deal with it on a daily basis, and it is

16

completely untrue. As we have stated time and time again, and clearly outlined in the meeting, PREPA is the only entity that assigns work and they choose not to do so based off their own decision due to internal financial constraints. That situation still exists today.

62.     When Miller sent the January 28, 2019, email, Cobra had been assigned and paid hundreds of millions of dollars for projects under the Cobra MSC, having provided services for more than one hundred "work packages" and generated more than 2,000 invoices for payment.

63.     No other company had been assigned a single dollar of work pursuant to the RFP.

**Tribble Conspires with Ellison, Cobra, and Mammoth to Direct All Work to Cobra**

64.     On September 10, 2019, a federal grand jury indicted Tribble, Ellison, and Tribble's FEMA colleague, Jovanda Patterson, in the United States District Court for the District of Puerto Rico.  *See* Indictment [D.E. 1], *United States v. Tribble, et al.*, No. 19-cr-541 (D.P.R. Sept. 10, 2019) (the "Indictment").   The Indictment comprised fifteen counts including Conspiracy to Commit Bribery, in violation of 18 U.S.C. § 371; Honest Services Wire Fraud, in violation of 18 U.S.C. §§ 1343 and 1346; Disaster Fraud, in violation of 18 U.S.C. §§ 1040 and 1042; and Wire Fraud, in violation of 18 U.S.C. § 1343.

65.     Each count was based on allegations that Ellison conspired with Tribble to direct valuable restoration work on Puerto Rico's electrical grid to Cobra.   As Deputy Regional Administrator for FEMA, Region II, Tribble was responsible for planning, directing, and coordinating all projects in the region, as well as making day-to-day operational management decisions.   As Recovery Office Deputy Director – Infrastructure Directorate, Tribble was responsible for approving requisitions for supplies and services and approving Public Assistance Project Worksheets up to $200 million. Ultimately, Tribble was the gatekeeper for all public funds at FEMA's disposal for recovery work in Puerto Rico.

66.     Ellison bribed Tribble in order to induce her to abuse her position to steer hundreds of millions of dollars in profits to Mammoth and Cobra, to the detriment of and in prejudice to MasTec's contractual rights with PREPA.  In 2018 alone, Ellison provided Tribble:

    a.  A hotel room in New York from January 31 through February 2, 2018;

    b.  A helicopter tour of Puerto Rico on February 7, 2018;

    c.  Hotel accommodations in Fort Lauderdale, Florida on July 17 and 18, 2018;

    d.  Airfare from Miami to Orlando, Florida on July 20, 2018;

    e.  First-class airfare from San Juan to New York on September 22, 2018;

    f.  Personal security services in November and December 2018;

    g.  Roundtrip airfare from Washington, D.C. to Charlotte, North Carolina on November 29 to November 30, 2018;

    h.  Hotel accommodations in Charlotte, North Carolina from November 29 to 30, 2018; and

    i.  Access to and use of an apartment in San Juan, Puerto Rico.

67.     Tribble and Ellison were in constant communication between December 2017 and December 2018, if not longer.  Their text messages and emails, many of which Ellison sent from his Mammoth email address,[6] reflect additional consideration Ellison gave Tribble in exchange for valuable work assignments in Puerto Rico.  For example, Ellison arranged a job at Cobra for Tribble's friend and colleague, Jovanda Patterson.  Patterson had served as a deputy chief of staff at FEMA, but left the agency in July 2018 to accept the job at Cobra.  Ellison arranged the position for Patterson to satisfy Tribble: on March 22, 2018, Tribble emailed Ellison asking about Ellison's intentions regarding Patterson, expressing concern that Patterson's current salary would not allow

---

[6]  Ellison's business email address ended with the identifier "@mammothenergy.com."

her to move to New York.  Ellison confirmed to Tribble that he would "take care of" Patterson, and that Cobra would employ Patterson as a rotation coordinator in Puerto Rico as a first step.

68.     Six weeks later, on June 1, 2018, Cobra's Director of Human Resources emailed Patterson a letter offering her a position in Business Development at Cobra Logistics, at an annual salary of $160,000.00, with a bonus of up to 30% of her salary, plus per diem.  This was more than double Patterson's FEMA salary, which was less than $100,000.00.

69.     Ellison also helped Tribble secure an apartment in New York City.  On February 11, 2018, Tribble sent an email from her personal email account to Ellison's personal email account requesting assistance in procuring an apartment in New York, and describing her needs as to location, safety, and furnishings.  Three days later, Ellison responded, "Yes ma'am, I got it and have somebody on it already."

70.     On February 23, 2018, Ellison forwarded an email to Tribble from his personal account with the subject line "NYC Apartment/Broker Introduction," stating "Please reach out to Jay about your needs."

71.     Finally, Tribble kept photographs of the front and back of Ellison's personal credit card in her iCloud Photo Library.  Ellison had sent Tribble the image for her personal use,[7] and in exchange for her assistance in Puerto Rico.

72.     In exchange for these gifts and benefits, Tribble shared critical inside information with Ellison about the status of various projects in Puerto Rico.  In fact, federal investigators found a photograph of a Contractor's Rate Schedule in Ellison's iCloud photo library which had been submitted to PREPA by a Cobra competitor, identified in the Indictment as "Company B."  On

---

[7]   On December 24, 2018, for example, Tribble and Ellison exchanged text messages regarding Tribble's use of Ellison's credit card for her travel expenses.

information and belief, MasTec is Company B, and Tribble forwarded the rate schedule to Ellison in exchange for the inducements described above.

73.     Tribble passed Ellison a steady flow of information behind the scenes.   For example, on December 8, 2017, Ellison emailed Tribble and asked for the status of a FEMA legal review.  Tribble responded that FEMA lawyers had completed their review and reported that she was communicating with PREPA and the Governor of Puerto Rico about processing invoices for Cobra.

74.     On or around December 23, 2017, Tribble had a letter sent from FEMA's federal coordinating officer to the Puerto Rico Government's authorized representative explaining that FEMA had determined that costs under the First Cobra Contract were reasonable.  Eighteen months later, the Department of Homeland Security Office of Inspector General ("OIG") would reveal that FEMA's eligibility determination of Cobra's contract costs had been unsound and lacked supporting documentation.[8]

---

[8] The OIG concluded in its July 19, 2019 report that FEMA's "eligibility determination of Cobra Acquisitions LLC (Cobra) contract costs for the Public Assistance (PA) Grant Program was not sound and lacked supporting documentation."  The OIG identified five reasons why FEMA's reasonableness determination had been unsound:

> (i)   FEMA did not evaluate the reasonableness of the actual time and materials costs incurred under the First Cobra Contract;

> (ii)  FEMA improperly analyzed the cost reasonableness of the contract rates for labor;

> (iii) FEMA's cost-reasonableness analysis of Cobra's equipment rates was incomplete and unsupported;

> (iv)  FEMA did not fully analyze the reasonableness of additional costs, such as Cobra's costs for helicopters, fuel, security, and logistics; and

> (v)   FEMA did not consider compliance with contract terms in its review of Cobra's costs to transport equipment and people to Puerto Rico.

75.     On February 9, 2018, Tribble received an email from a PREPA consultant attaching Amendment No. 5 to the First Cobra Contract for review by the Office of Contract and Procurement Compliance at PREPA, and asking Tribble to review the amendment and its attachments.  Tribble forwarded the email to her personal email account, and then from her personal email account to Ellison.

76.     Ellison and Tribble's communications also reveal a striking campaign by Ellison and Tribble to manufacture work opportunities, funnel those opportunities to Cobra, and inflate Tribble's reputation by having her take credit for the projects.

77.     In a series of emails regarding a redesign and "hardening" of the distribution system in Vieques, a small island-municipality eight miles off Puerto Rico's east coast, Tribble coordinated with Ellison regarding the details, and ultimately the direction, of the work plan.  First, on March 30, 2018, Ellison sent an email from his personal email account to Tribble's personal email account attaching a Word document entitled "PR Electrical Grid – Standard Modernization and Hardening of Infrastructure (Draft in Process)."  Tribble responded on the same date with comments, attaching a draft entitled "PR Electrical Grid – Standard Modernization and Hardening of Infrastructure (Draft in Process)_AT."  She commented in her email, "This is fantastic. Thank you.  I have some comments in the attached just for clarification.  Then I want to push a little more on the pros/cons of a COOP model.  I will write it and share it for comment.  Will you be in early enough to meet the FEMA administrator (your fellow Southerner) on Tuesday?"

---

The irregularities in Cobra's contracts were readily apparent. In July of 2018, the incoming head of PREPA immediately observed that Cobra's contracts, involving more than $1.8 billion and rates of about $4,000 per worker per day in many cases, needed closer scrutiny: "It will be reevaluated…Certainly the numbers merit being looked at very closely." Weissenstein, Michael & Coto, Danica, *Turmoil Slows Rebuilding of Puerto Rico's Power Grip* (July 19, 2018), available at https://www.wabi.tv/content/news/Turmoil-slows-rebuilding-of-Puerto-Ricos-power-grid-488655291.html (last visited January 21, 2020).

78.     On April 4, 2018, Tribble documented that she had proposed a redesign of the Vieques distribution system to FEMA and PREPA officials with more standardized voltages, more resilient poles, and new wire.  The proposed redesign had been developed by Cobra and was based on the Word document provided by Ellison. Tribble then orchestrated the acceptance of Cobra's specifications and then Cobra's engagement in the execution of the proposed redesign.

79.     On April 8, 2018, Tribble forwarded to Ellison an email she had sent to an unidentified individual from her personal email account.  Tribble's email to the unidentified individual attached a version of the Word document she had received from Ellison and revised, and read, "This is a draft, but you can see where we are going."

80.     On April 10, 2018, Tribble forwarded to Ellison an email she had received on March 27, 2018, with facts sheets for the restoration of Vieques and Culebra.  One of the documents referenced in the email was designated "Official Use Only," and was not meant to be shared outside of FEMA.

81.     On April 16, 2018, Ellison sent an email to Tribble's personal email account regarding Puerto Rico Electrical Grid Standardization, Modernization, and Hardening, offering to tie Tribble in to a conversation in which he would ask questions of Oncor, a Texas electric utility, and American Electric Power, or AEP, a large, investor-owned utility.

82.     On April 21, 2018, Ellison sent Tribble an email attaching a FEMA Project Worksheet balance Microsoft Excel workbook, stating "Check out the tab labeled amendment 6. It is a big number if we want to fund the additional labor and cover the material for Vieques and [C]ulebra.  $500mm."  Tribble responded, "I have it but I need a burn rate vs. number of people. And we need to decide if the 110T/200D is the right mix.  Also, if we have to break out Vieques and Culebra, what is it?"

83.     On June 2, 2018, Tribble sent an email from her personal email account to Ellison's personal email account, referencing an attached draft document and addressing next steps. The next day, Tribble forwarded a chain of emails between herself and a PREPA consultant regarding monies PREPA owed to Cobra from her work email to her personal email. The subject line on the email was "$200M behind in payment to Cobra — stop work looming again." She then forwarded the emails from her personal email account to Ellison's personal email account.

84.     From March 2018 through November 2018, Tribble also directed, advised, and pressured PREPA executives and FEMA officials to facilitate a contract between PREPA and the Local Redevelopment Authority for Roosevelt Roads, which would allow Cobra to perform repair work at the Roosevelt Roads Naval Station.

85.     Tribble and Ellison also exchanged text messages for the duration of their conspiracy and fraudulent scheme. Their text messages further evidence that Tribble was working behind the scenes to funnel work exclusively to Cobra:



Screenshot of iMessage Message #1:

23



Screenshot of iMessage Message #2:

Screenshot of iMessage Message #3:

*See* Indictment ¶ 92.

86.     Ellison and Tribble also used Apple iMessage for another exchange on Christmas

24

Eve 2018, a few weeks before Tribble hosted her meeting to blame PREPA for MasTec not receiving work. *See supra* ¶¶ 59–63. In this exchange, Ellison and Tribble discussed Tribble using Ellison's credit card for travel expenses. *See* Indictment ¶ 93.

87.     Throughout the months of these secret communications between Tribble and Ellison, Tribble manipulated PREPA, lied to MasTec, strung MasTec along, and kept MasTec — like the people of Puerto Rico — in the dark.

88.     As a result, Cobra and Mammoth have (to date) received over $1.1 billion in payments. These payments were procured by fraud, to the direct detriment of MasTec. Cobra and Mammoth's fraud caused MasTec to forego other opportunities and incur millions of dollars in mobilization costs to meet its obligations under a $500 million MSC.  Because of Tribble's and others' assurances that MasTec would receive the maximum compensation under its MSC, it was reasonably foreseeable that Defendants' scheme would damage MasTec in the full amount of its lost opportunities, mobilization costs, and lost profits under the MSC.  Defendants must make MasTec whole.

## AGENCY, ALTER EGO, AND DIRECT LIABILITY

89.     At all relevant times, each of Mammoth, Cobra, and Ellison was a principal, agent, alter ego, joint venturer, partner, or affiliate of each other, and in doing the acts alleged herein, was acting within the course and scope of that principal, agent, alter ego, joint venture, partnership, or affiliate relationship. At all relevant times, Mammoth controlled the operations and conduct of Cobra and Ellison such that lines were blurred between Cobra's and Mammoth's corporate existence.

90.     Each of Mammoth, Cobra, and Ellison had actual knowledge of the contractual relationship between MasTec and PREPA, and the wrongful acts of each other; ratified, approved,

joined in, acquiesced, or authorized the wrongful acts of each other; and retained the benefits of those wrongful acts.

91.     Cobra and Mammoth share a principal place of business, at 14201 Caliber Drive, Suite 300, Oklahoma City, Oklahoma, and the roles of Mammoth and Cobra executives were interchangeable with respect to Cobra's operations. Cobra and Mammoth also share a web address; though available information about Cobra's corporate form and structure is scarce, Hoover's reports that Mammoth and Cobra share a phone number, and lists Cobra's web address as www.mammothenergy.com.[9] Ellison, ostensibly Cobra's sole representative, had a business email address ending in @mammothenergy.com, upon which he relied for his communications with Tribble in furtherance of the fraudulent scheme.  Representative emails between Ellison and Tribble are identified in the Indictment at ¶¶ 50–52, 54–55, 59, 67–69, 71–72, 107 & 118.

92.     Arty Straehla, CEO of Mammoth, signed the following contracts between PREPA and Cobra:

    a.  October 19, 2017, contract (signed by Straehla as Chief Executive Officer on behalf of Cobra Acquisitions LLC);

    b.  November 1, 2017, amendment (signed by Straehla as Chief Executive Officer on behalf of Cobra Acquisitions LLC);

    c.  December 8, 2017, amendment (signed by Straehla as Chief Executive Officer on behalf of Cobra Acquisitions LLC);

    d.  December 21, 2017, amendment (signed by Straehla as Chief Executive Officer on behalf of Cobra Acquisitions LLC);

    e.  January 28, 2018, amendment (signed by Straehla as Chief Executive Officer on behalf of Cobra Acquisitions LLC);

    f.  February 27, 2018, amendment (signed by both Straehla as Chief Executive Officer on behalf of Cobra Acquisitions LLC; and Ellison as

---

[9]   Cobra Acquisitions LLC,  http://www.hoovers.com/company-information/cs/company-profile.cobra_acquisitions_llc.ff83bae5758131e5.html?aka_re=1 (last visited 1/10/2020).

President of Cobra Acquisitions LLC);

g. May 26, 2018, contract (signed by Straehla as Chief Executive Officer on behalf of Cobra Acquisitions LLC).

93.     Upon information and belief, Arty Straehla held no official role with Cobra. His signatures on the above-referenced contracts do not represent whether he is signing on behalf of Mammoth or Cobra — merely that he is signing as CEO (his position at Mammoth).

94.     Mammoth also used Cobra for a fraudulent purpose. Cobra was formed in the second quarter of 2017, just months before Hurricane Maria made landfall in Puerto Rico. Mammoth's CEO immediately put Cobra forward for emergency restoration work in Puerto Rico and negotiated the First Cobra Contract and its amendments on Cobra's behalf. Cobra's corporate existence — including receipt of approximately $1.1 billion in federal funds for its work in Puerto Rico — has accordingly been devoted nearly exclusively to perpetrating a fraud for Mammoth's financial benefit and to MasTec's detriment. Mammoth's 2019 financials reflect $227 million in outstanding receivables from PREPA. And as part of Mammoth's collection efforts, Mammoth CFO Mark Layton, on at least one occasion in March 2019, traveled to Puerto Rico on behalf of Mammoth to collect funds purportedly owed by PREPA.

95.     In a January 19, 2017, Mammoth press release, Arty Straehla, Mammoth's CEO, touted that,

> We are honored to be chosen to help restore the electric utility infrastructure for the residents of Puerto Rico. After witnessing the destruction from Hurricane Maria first hand last weekend, where 85% of Puerto Rico's residents are currently living without electricity, we intend to work quickly both to help rebuild the electric grid and to help restore normalcy to people's lives.

The release further announced that Cobra's contract "will be incremental to Mammoth's existing energy service operations."

96.     An October 29, 2017, news article reported that, when reached by phone for

comment,

> Ellison defended his company's contract while noting that he could only speak in a personal, unofficial capacity. "We felt we had a really good package put together that would provide for the community without taking needed resources away from the island," he said, characterizing his company's relationship with PREPA as a "standard bidding process for a storm contract." Ellison deferred official comment on specific contractual language to Mammoth representatives.

The article goes on, quoting Mammoth CEO Arty Straehla:

> "The contract is with PREPA," he said, but "in the room every step of the way was FEMA, so that it does comply with FEMA reimbursement requirements; so quite honestly, we wouldn't have entered this contract if we didn't think we'd get paid. We feel very, very strongly about that." Asked if the company faced any risk from milestones to meet or other contract terms, Straehla was unequivocal. "No," he said. "Certainly you spend a lot of time on the upfront contract, some all-night drafting sessions and that type of thing . . . but we wanted to make sure that we got paid."

## <u>TOLLING OR NON-ACCRUAL OF STATUTES OF LIMITATION</u>

97.    MasTec did not discover, and could not have discovered, the facts constituting Defendants' participation in the above-described scheme until the Indictment was made available to the public on September 10, 2019.

98.    Cobra, Mammoth, and their co-conspirators concealed their scheme from MasTec, and from the public, at all times relevant to the events described in this Complaint.

99.    Because MasTec could not have reasonably discovered the facts constituting Defendants' conduct until September 10, 2019, its claims accrued on that date and all applicable statutes of limitation were tolled until that date.

## COUNT I
## <u>Violation of RICO, 18 U.S.C. § 1962(c)</u>

100.    Plaintiff incorporates paragraphs 1 through 99 herein as if fully set forth in Count I.

101.    This claim arises under 18 U.S.C. § 1962(c), which makes it "unlawful for any

person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ."

102.    At all times relevant to the allegations set forth herein, Defendants Mammoth and Cobra were persons within the meaning of 18 U.S.C. § 1961(3), because both Mammoth and Cobra were "capable of holding a legal or beneficial interest in property."

103.    Mammoth and Cobra were employed by and associated with an illegal enterprise, composed of Mammoth, Cobra, Tribble, Patterson, and others, and conducted and participated in that enterprise's affairs through a pattern of racketeering activity consisting of bribery, as well as numerous and repeated uses of the interstate wire communications to execute a scheme to defraud, all in violation of RICO, 18 U.S.C. § 1962(c).  These acts of bribery and mail and wire fraud are detailed above in paragraphs 47–51, 53–63, and 66–86.

104.    Mammoth, Cobra, Tribble, Patterson, and others operated the illegal enterprise continuously for more than one year with the common purpose of directing federal funds to Mammoth and Cobra, and away from MasTec, in exchange for financial benefits and other inducements to Tribble and Patterson, as described herein.

105.    Mammoth and Cobra participated in the operation and management of the enterprise by the following acts, among others:

- Inducing Tribble to direct work to Cobra, rather than MasTec, by pressuring PREPA to assign valuable work to Cobra;

- Inducing Tribble to send Ellison critical information about the bidding process and potential work on the island, including MasTec's rate schedule;

- Inducing Tribble to direct work to Cobra by altering PWs prepared by MasTec and submitting them under Cobra's name;

29

- Giving Tribble things of value in exchange for her cooperation, including, but not limited to, hotel rooms, airfare, a security detail, and an apartment in Puerto Rico; and

- Offering Patterson a job at Cobra Logistics in exchange for her and/or Tribble's cooperation.

106. Mammoth and Cobra bribed Tribble, in violation of 18 U.S.C. § 201, *see* ¶¶ 47–51, 66–71, 86, *supra*, and used the mails and wires in furtherance of a scheme to defraud, in violation of 18 U.S.C. §§ 1341 and 1343, *see* ¶¶ 53–63, 66–85, *supra*,

107. MasTec sustained injuries to its business or property by reason of Mammoth's and Cobra's violations of 18 U.S.C. 1962(c), in that MasTec lost valuable contracts and profits to which it was entitled, including under the MasTec MSC, as a direct result of Mammoth's and Cobra's wrongful interference, payment of bribes, and other inducements to Tribble in exchange for work. MasTec also sustained injuries to its business or property in the form of costs expended mobilizing to, and remaining in, Puerto Rico as a direct result of Mammoth and Cobra's misconduct.

**WHEREFORE**, Plaintiff MasTec seeks all damages available by law, including but not limited to lost profits, mobilization expenses, lost opportunity damages, and treble damages, as well as prejudgment interest and attorneys' fees and costs pursuant to 18 U.S.C. § 1964(c).

## COUNT II
## Violation of RICO, 18 U.S.C. § 1962(d)

108. Plaintiff incorporates paragraphs 1 through 107 herein as if fully set forth in Count II.

109. At all relevant times, Defendants were associated with the enterprise and agreed and conspired to violate 18 U.S.C. § 1962(c). Defendants agreed to conduct and participate, directly and indirectly, in the conduct and affairs of the enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d).

30

110.    Mammoth and Cobra illegally agreed to violate RICO, 18 U.S.C. § 1962(c) and (d), by agreeing, through Ellison, to give Tribble things of value in exchange for inside information and valuable work assignments in Puerto Rico.

111.    Defendants committed and caused to be committed a series of overt acts in furtherance of the conspiracy and to affect the objects thereof, including but not limited to the acts set forth above.

112.    As a result of Defendants' violations of 18 U.S.C. § 1962(d), Plaintiff suffered injuries to its business property in that MasTec lost valuable contracts and profits to which it was entitled, including under the MasTec MSC, as a direct result of Mammoth's and Cobra's wrongful interference, payment of bribes, and other inducements to Tribble in exchange for work.  MasTec also sustained injuries to its business or property in the form of costs expended mobilizing to and remaining in Puerto Rico as a direct result of Mammoth and Cobra's misconduct.

**WHEREFORE**, Plaintiff MasTec seeks all damages available by law, including but not limited to lost profits, mobilization expenses, lost opportunity damages, and treble damages, as well as prejudgment interest and attorneys' fees and costs pursuant to 18 U.S.C. § 1964(c).

### COUNT III
### Tortious Interference

113.    Plaintiff incorporates paragraphs 1 through 99 herein as if fully set forth in Count III.

114.    MasTec and PREPA executed the MasTec MSC, a valid and binding contract, on May 29, 2018.

115.    The MasTec MSC was for a one-year fixed-period of time, and PREPA issued a Notice to Proceed.

116.    Under the MasTec MSC, PREPA agreed to pay MasTec up to $500 million in

compensation in exchange for labor, supervision, tools, equipment, and materials necessary to perform hurricane restoration and reconstruction services in Puerto Rico after Hurricane Maria.

117.   At all relevant times, Defendants were fully aware of the existence of the MasTec MSC for, among others, the following reasons: they participated in the same RFP process; the award of the MSC to MasTec was widely publicized; MasTec participated in various meetings at which Cobra and Mammoth personnel were also in attendance; and Defendants maintained a close and corrupt relationship with Tribble.

118.   Defendants interfered with the MasTec MSC by giving things of value to Tribble in exchange for inside information and valuable work assignments from FEMA, and to cause PREPA to funnel all related restoration and reconstruction work to Mammoth and Cobra.

119.   Defendants interfered with the MasTec MSC with the intent to deprive MasTec of contractually-acquired rights, despite MasTec having received a Notice to Proceed under the MasTec MSC.

120.   As a direct and proximate result of Mammoth's and Cobra's wrongful conduct, and despite the urgent need to restore and repair Puerto Rico's electric grid, MasTec was not assigned any work under the MasTec MSC.

121.   Instead, all work arising under the RFP was directed to Defendants.

122.   MasTec was injured and damaged as a direct and proximate result of Defendants' wrongful conduct, in that MasTec lost work and compensation under the MasTec MSC, as well as expended millions of dollars to mobilize to and remain in Puerto Rico.

**WHEREFORE**, Plaintiff seek a judgment in their favor against Defendants for the actual damages suffered by them as a result of this tortious interference, including but not limited to lost profits, mobilization expenses, lost opportunity damages, costs, and prejudgment interest.

## COUNT IV
### Violation of 31 L.P.R.A. § 5141

123.    Plaintiff incorporates paragraphs 1 through 99 herein as if fully set forth in Count IV.

124.    Mammoth and Cobra committed wrongful and culpable acts and/or omissions, described herein, including bribing FEMA official Ahsha Tribble in order to procure her cooperation in funneling valuable assignments away from MasTec and to Mammoth and Cobra, which was to the detriment of MasTec.

125.    Likewise, Defendants, acting in concert with Tribble, manipulated, misled, and caused PREPA to divert all restoration and reconstruction work to Mammoth and Cobra, in an effort to cause harm to MasTec.

126.    By the intentional conduct described herein, Mammoth and Cobra did not act in good faith.  The harm that resulted from their fraudulent and wrongful conduct was foreseeable.

127.    These wrongful actions by Mammoth and Cobra resulted in economic injury to MasTec and were the proximate cause of MasTec sustaining foreseeable damages including, but not limited to, lost compensation and profits under the MasTec MSC, lost business opportunities, and costs incurred mobilizing to, and remaining in, Puerto Rico while MasTec awaited its assignments.

**WHEREFORE**, Plaintiff seek a judgment in their favor against Defendants for the actual damages suffered by them as a result of this tortious conduct, including but not limited to lost profits, mobilization expenses, lost opportunity damages, costs, and prejudgment interest.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a jury trial for any and all issues triable

by a jury.

Dated:     January 21, 2020

Respectfully submitted,

/s/ *Benjamin Widlanski*
Benjamin Widlanski, Esq.
Florida Bar No. 1010644
bwidlanski@kttlaw.com
Jorge Piedra, Esq.
Florida Bar No. 88315
jpiedra@kttlaw.com
Rachel Sullivan, Esq.
Florida Bar No. 815640
rs@kttlaw.com
Tal J. Lifshitz, Esq.
Florida Bar No. 99519
tjl@kttlaw.com
**KOZYAK TROPIN &
THROCKMORTON LLP**
2525 Ponce de Leon Blvd., 9th Floor
Coral Gables, FL 33134
Telephone:    (305) 372-1800
Facsimile:    (305) 372-3508

*Counsel for Plaintiff MasTec Renewables
Puerto Rico, LLC*