United States District Court
for the
Southern District of Florida

| | |
|---|---|
| MasTec Renewables Puerto Rico LLC, Plaintiff, <br><br> v. <br><br> Mammoth Energy Services, Inc. and Cobra Acquisitions, LLC, Defendants. | ) <br> ) <br> ) <br> ) <br> ) Civil Action No. 20-20263-Civ-Scola <br> ) <br> ) <br> ) <br> ) |

### Order Granting in Part and Deferring in Part Motions to Dismiss

Plaintiff MasTec Renewables Puerto Rico LLC ("MasTec") seeks to recover damages from Defendants Mammoth Energy Services, Inc. ("Mammoth") and Cobra Acquisitions, LLC ("Cobra") for projects it says the Defendants diverted to themselves, and away from MasTec, through a bribery scheme involving a Federal Emergency Management Administration official in the wake of Hurricane Maria. (Compl., ECF No. 1.) In its complaint, MasTec sets forth claims (1) under the federal Racketeer Influenced and Corrupt Organizations Act (counts one and two), (2) for tortious interference (count three), and (3) for violations of section 5141 of Title 31 of the Laws of Puerto Rico Annotated (count four). (*Id.* ¶ 11.) Both Defendants have filed motions to dismiss the complaint in which they argue MasTec fails to state claims for relief under RICO, for tortious interference, or for a violation of Puerto Rican law. (Cobra's Mot., ECF No. 17, 12–18, 20–23; Mammoth's Mot., ECF No. 16, 7–10, 11–12.) Both Defendants also maintain the complaint should be dismissed for a lack of personal jurisdiction. (Cobra's Mot. at 12; Mammoth's Mot. at 10–11.) Lastly, Mammoth contends MasTec's claims fail against it for the additional reason that MasTec does not adequately plead that Mammoth is an alter ego of Cobra. (Mammoth's Mot. at 13–16.) After careful review, the Court agrees with the Defendants that MasTec's complaint falls short of pleading RICO violations and grants the Defendants' motion, in part, on that basis. In reviewing the record, upon dismissing MasTec's federal claims, however, the Court finds itself unsure of whether it has subject-matter jurisdiction over the remaining, non-federal claims and, therefore, defers ruling on those portions of the motions directed at counts three and four. Accordingly, the Court **grants** the Defendants' motions to dismiss, **in part**, and **defers ruling** on them, **in part** (**ECF Nos. 16, 17**). The Court orders MasTec to provide a response to the Court's concerns regarding diversity jurisdiction on or before **October 23, 2020**.

### 1. Background and Facts[1]

Hurricane Maria made landfall in Puerto Rico as a Category 4 storm on September 20, 2017. (Compl. ¶ 1.) The storm wiped out the island's electricity, destroyed much of its infrastructure, and ultimately caused the deaths of more than 3,000 people. (*Id.*) Just two weeks earlier, another storm, Hurricane Irma, had already left about two-thirds of the island without electricity. (*Id.* ¶ 25.) On the day Hurricane Maria hit Puerto Rico, the president of the United States issued a major disaster declaration, authorizing FEMA to allocate such available disaster-relief funds as were necessary to provide disaster assistance and to cover related administrative expenses. (*Id.* ¶ 26.) The Puerto Rico Electric Power Authority ("PREPA") triggered an emergency protocol and began searching for private contractors to immediately begin work to restore the island's power. (*Id.*)

On October 13, less than a month after the storm, PREPA notified MasTec—an infrastructure construction company that specializes, among other things, in the emergency restoration of electrical power after natural disasters—that it was being considered as a potential contractor. (*Id.* ¶¶ 13, 27.) Less than a week later, however, PREPA executed its first "Emergency Master Services Agreement" with Cobra. (*Id.* ¶ 29.) Cobra, in stark comparison to MasTec, was new to large-scale electric infrastructure restoration, having been just recently formed by its parent, Mammoth, itself an oilfield-services and fossil-fuel company, just months earlier. (*Id.*) Cobra was Mammoth's first foray into the energy infrastructure business. (*Id.*) Mammoth's CEO and director, Arty Straehla, negotiated and executed this initial contract on Cobra's behalf. (*Id.*) The contract, in its initial form, provided for a one-year term and a maximum compensation to Cobra of $200 million, with a $15 million deposit due upon execution. (*Id.* ¶ 30.) FEMA reviewed this contract, approving it and committing $200 million in public funds for the costs of the initial contract. (*Id.* ¶ 31.) This initial contract later evolved, and, after five amendments, by February 27, 2018, Cobra's maximum compensation was increased to $945,429,800, which FEMA also approved. (*Id.* ¶ 33.)

In the meantime, in addition to PREPA's first contract with Cobra, PREPA issued a second request for proposals, on February 16, 2018, seeking more bids from electrical contractors to continue to rebuild and restore Puerto Rico's electric grid. (*Id.* ¶¶ 26, 34.) After considering this second round of bids, PREPA awarded two more contracts: another contract with Cobra, allowing up to $900 million in compensation; and a contract with MasTec, providing for a maximum

---

[1] The Court accepts MasTec's factual allegations as true for the purposes of evaluating the Defendants' motions to dismiss. *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997).

of $500 million in compensation. (*Id.* ¶ 3.) Both contracts, executed in May 2018, were for a term of one year. (*Id.* ¶ 41.) These contracts covered "the $1.4 billion allotted to FEMA for its recovery efforts in Puerto Rico." (*Id.* ¶ 3)

After being awarded the $500-million-maximum-compensation contract, MasTec immediately began mobilizing, as it disclosed it would in its proposal to PREPA, initiating the transport of equipment, materials, construction supervision, craft labor, and MasTec's project management team for deployment to Puerto Rico. (*Id.* ¶¶ 4, 37, 43.) In initiating this massive mobilization effort, MasTec incurred over $15 million in expenses. (*Id.* ¶¶ 4, 46.)

Months earlier, however, Asha Nateef Tribble, FEMA's Deputy Regional Administrator for Region II—serving New Jersey, New York, Puerto Rico, and the U.S. Virgin Islands—had begun, although it's not clear exactly when, accepting bribes from Donald Keith Ellison, Cobra's president. (*Id.* ¶ 47.) In providing these bribes, Ellison sought to, and did, induce Tribble into diverting all restoration work to Cobra, to MasTec's detriment. (*Id.* ¶ 1, 5–7, 17.) Ellison's bribes took many forms: hotel accommodations in New York (from January 31 through February 2, 2018), in Fort Lauderdale (from July 17 to 18, 2018), and in North Carolina (from November 29 to 30, 2018); a helicopter tour of Puerto Rico in February 2018; plane tickets for travel from Miami to Orlando (on July 20, 2018), from San Juan to New York (first class, on September 22, 2018), and from Washington, D.C. to Charlotte, North Carolina, roundtrip (on November 29 and 30, 2018); personal security services in November and December 2018; use of an apartment in San Juan, Puerto Rico; assistance, in February 2018, with securing an apartment in New York City; and access to Ellison's personal credit card for Tribble's own use, extending at least into December 2018. (*Id.* ¶¶ 7, 66, 69–71.) Additionally, in March 2018, Tribble contacted Ellison about securing a job at Cobra, or a Cobra affiliate, for her friend, Jovanda Patterson. (*Id.* ¶¶ 48, 67.) Just over a month later, on June 1, 2018, a Cobra affiliate, at Ellison's prompting, it appears, offered Patterson a lucrative position, more than doubling her current salary at FEMA. (*Id.* ¶¶ 48, 67, 68.) Six days later, PREPA sent MasTec a notice of suspension of work, directing MasTec, without any reason, to stop any work under its contract, including its mobilization efforts. (*Id.* ¶ 49.) Despite the suspension, a PREPA representative assured MasTec the suspension would be brief, and a new start date would issue soon. (*Id.*)

The day after the suspension notice issued, and unbeknownst to MasTec at the time, Tribble and Ellison were exchanging emails through their personal accounts, about meeting up at a hotel and discussing Tribble's upcoming travel plans. (*Id.* ¶ 50.) In the meantime, believing further delays would be brief and that funding for its work under the contract would be secured, MasTec, on June 14, 2018, began actually shipping equipment and supplies from West Palm

Beach to Puerto Rico. (*Id.* ¶ 52.) The anticipated work for MasTec, though, never materialized. Despite assurances and excuses from Tribble during meetings with FEMA, PREPA, MasTec, and Cobra in July and August 2018 and with FEMA, PREPA, and MasTec in January 2019, MasTec remained sidelined while PREPA routinely assigned project after project exclusively to Cobra. (*Id.* ¶ 54, 58–59, 62.)

While MasTec was strung along by FEMA, through Tribble or her reports, who blamed PREPA for failing to assign any work to MasTec, Tribble and Ellison were in constant communication, often through their personal cell phone and email accounts. (*Id.* ¶ 67.) As early as December 2017, Tribble, in exchange for bribes from Ellison, shared critical insider information and confidential documents (including, it appears, MasTec's own proprietary information), and the status of Hurricane Maria restoration projects in Puerto Rico. (*Id.* ¶¶ 72–75.) Throughout their communications, Ellison and Tribble also plotted to manufacture restoration-work opportunities that could be funneled to Cobra and used to bolster Tribble's reputation within FEMA, by having her take credit for various projects. (*Id.* ¶ 76.) For example, in March and April 2018, Tribble and Ellison coordinated a workplan that would result in Cobra's involvement in a redesign and "hardening" of the distribution system in Vieques, a small island-municipality off the east coast of Puerto Rico. (*Id.* ¶ 77.) Tribble, based on documents prepared by Cobra and provided by Ellison, proposed the system redesign to FEMA and PREPA officials. (*Id.* ¶ 78.) In the process, Tribble shared FEMA documents marked for "Official Use Only" with Ellison. (*Id.* ¶ 80.) While orchestrating work for Cobra on Vieques (and another island municipality, Culebra), and other behind-the-scenes maneuverings, Tribble also sought, from March through November 2018, to manufacture restoration work for Cobra at the Roosevelt Roads Naval Station. (*Id.* ¶ 84, 85.) While the restoration of Puerto Rico's electric grid was finally completed in April 2019, MasTec never received a single work order or any compensation whatsoever arising out of its $500 million contract. (*Id.* ¶¶ 1, 5.) In the end, throughout the months of Tribble and Ellison's secret communications and scheming, Tribble, as MasTec describes it, "lied to MasTec, strung MasTec along, and kept MasTec—like the people of Puerto Rico—in the dark." (*Id.* ¶ 87.)

Eventually, as a result of their scheme, Tribble and Ellison, on September 10, 2019, were indicted, along with Patterson, by a federal grand jury in the District of Puerto Rico. (*Id.* ¶ 64.) The indictment included fifteen counts, among them counts for conspiracy to commit bribery, honest-services wire fraud, disaster fraud, and wire fraud. (*Id.*) As a result of Tribble and Ellison's scheming, Cobra and Mammoth received over $1.1 billion in FEMA payments for their purported work in restoring Puerto Rico's electric grid. (*Id.* ¶ 5, 88.)

### 2. Legal Standard

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court must accept all the complaint's allegations as true, construing them in the light most favorable to the plaintiff. *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008). A pleading must only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A motion to dismiss under Rule 12(b)(6) challenges the legal sufficiency of a complaint. *See* Fed. R. Civ. P. 12(b)(6). In assessing the legal sufficiency of a complaint's allegations, the Court is bound to apply the pleading standard articulated in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). That is, the complaint "must . . . contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1289 (11th Cir. 2010) (quoting *Twombly*, 550 U.S. at 570). "Dismissal is therefore permitted when on the basis of a dispositive issue of law, no construction of the factual allegations will support the cause of action." *Glover v. Liggett Grp., Inc.*, 459 F.3d 1304, 1308 (11th Cir. 2006) (internal quotations omitted) (citing *Marshall Cnty. Bd. of Educ. v. Marshall Cnty. Gas Dist.*, 992 F.2d 1171, 1174 (11th Cir. 1993). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* A court must dismiss a plaintiff's claims if he fails to nudge his "claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

Thus, a pleading that offers mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" will not survive dismissal. *See Id.* at 555. "Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 679.

### 3. Discussion

#### A. MasTec fails to state a claim for violations of RICO.

The Defendants argue the complaint fails to set forth claims for RICO violations. In support, they maintain, variously, (1) MasTec does not sufficiently allege a RICO enterprise; (2) MasTec fails to plead that either Defendant directed the affairs of any enterprise; (3) MasTec does not set forth a pattern of racketeering activity; (4) MasTec does not plead facts establishing proximate

cause; (4) MasTec fails to plead that Mammoth committed any predicate acts; and (5) MasTec does not allege a RICO conspiracy. After careful review, the Court agrees with the Defendants that MasTec has failed to set forth facts that would establish a pattern of racketeering. Because of this deficiency alone, the Court finds MasTec has failed to state any claims under RICO.

"To establish a federal civil RICO violation under § 1964(c), a plaintiff must prove (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity and (5) injury to business or property (6) that was by reason of the substantive RICO violation." *Corcel Corp., Inc. v. Ferguson Enterprises, Inc.*, 551 Fed. App'x 571, 575 (11th Cir. 2014) (cleaned up).[2] To plead a pattern of racketeering activity, as required by elements three and four, a plaintiff must allege: (1) the defendants committed two or more predicate acts within a ten-year time span; (2) the predicate acts were related to one another; and (3) the predicate acts demonstrated criminal conduct of a continuing nature. *Cont'l Cas. Co. v. Cura Grp., Inc.*, No. 03-61846-CIV, 2005 WL 8155321, at *10 (S.D. Fla. Apr. 6, 2005) (Altonaga, J.) (citing 18 U.S.C. § 1961(5)). The "continuing nature" of the criminal conduct, set forth in the third prong, can be established in one of two ways: relying on either a closed- or open-ended theory of continuity. *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 241 (1989). The former theory refers to "a closed period of repeated conduct," while the latter implicates "past conduct that by its nature projects into the future with a threat of repetition." *Id.* "A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time." *Id.* at 242. A RICO action, however, will often "be brought before continuity can be established in this way." *Id.* "In such cases," then, a plaintiff must rely on an open-ended theory and establishing liability on that basis "depends on whether the *threat* of continuity is demonstrated." *Id.* (emphasis in original). The continuity aspect of a RICO claim is vitally important because "RICO was designed to create liability for longstanding racketeering activity, and not isolated schemes." *Emess Capital, LLC v. Rothstein*, 10-60882-CIV, 2011 WL 13214302, at *6 (S.D. Fla. Mar. 9, 2011) (Goodman, Mag. J.), *rep. and recommendation adopted*, 10-60882-CIV, 2011 WL 13214308 (S.D. Fla. Dec. 21, 2011) (Lenard, J.).

Here, MasTec concedes it has not alleged a close-ended pattern of racketeering activity and instead relies on an open-ended theory. (Pl.'s Resp. at

---

[2] The Court uses "(cleaned up)" to indicate internal quotation marks, alterations, or citations have been omitted from quotations. *See, e.g.*, *Durham v. Rural/Metro Corp.*, 955 F.3d 1279, 1285 (11th Cir. 2020).

22.) In order to establish a RICO claim premised on open-ended continuity, based on a threat of continuity, MasTec can meet its "burden by establishing either that the racketeering acts themselves include a specific threat of repetition extending indefinitely into the future, or that the predicate acts or offenses are part of an ongoing entity's regular way of doing business." *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1265 (11th Cir. 2004). In relying on the threat-of-repetition prong,[3] MasTec submits that, had Tribble and Ellison not been investigated and indicted for their scheme, their racketeering activity "would have continued indefinitely into the future." (Pl.'s Resp. at 23, 25.) The allegations in the complaint, however, do not support MasTec's position. Indeed, aside from a dearth of factual support, some of MasTec's allegations actually affirmatively foreclose an inference of indefinite repetition of the alleged racketeering activity.

For example, in its complaint, MasTec says power was fully restored to Puerto's Rico's electric grid by April 2019. (Compl. at ¶1.) Additionally, MasTec relays that, although FEMA allotted massive sums for the electric-grid restoration efforts, those amounts were nonetheless finite. (*See, e.g., id.* ¶¶ 3 ("[T]hese contracts covered the $1.4 billion allotted to FEMA for its recovery efforts in Puerto Rico."), 26 (noting that the president authorized FEMA to allocate such available disaster relief funds as were necessary to provide disaster assistance and cover expenses, prompting PREPA to seek bids for rebuilding and restoring the grid), 53 (recognizing Tribble's efforts to make sure that all funds allocated to electrical restoration work on the island were directed to the Defendants).) MasTec does not allege a single fact that indicates any of the racketeering acts specifically threatened repetition extending indefinitely into the future. Instead, the allegations focus exclusively on FEMA funds allocated to Puerto Rico to restore its electric grid in the wake of Hurricane Maria. Not one allegation reveals any involved party's intent to apply the scheme to future disasters.

MasTec's proffer, in opposing the motions to dismiss, that "[t]here is no reason to believe that the scheme would have ended once the projects arising from the [contracts] were complete, as hurricanes, earthquakes, and other events under FEMA's purview are routine occurrences in Tribble's jurisdiction, and the scheme generated a significant revenue stream for Mammoth and Cobra" (Pl.'s Resp. at 25), misses the mark. First, that it would have been entirely possible for Tribble and Ellison to apply their machinations to a future disaster is not enough. The standard, instead, requires a showing that there is

---

[3] MasTec does not contend that the alleged racketeering acts are the Defendants' regular way of doing business.

actually "a specific threat of repetition extending indefinitely into the future." *Jackson*, 372 F.3d at 1265. And, simply relying on "conclusory allegations that[,] once begun, the alleged misconduct threatens to continue into the future," is insufficient. *Kivisto v. Miller, Canfield, Paddock & Stone, PLC*, 413 Fed. App'x 136, 138 (11th Cir. 2011); *see Jackson*, 372 F.3d at 1268–69 (finding that a "plaintiff['s] bald suggestion that . . . defendants might have continued their fraud in the future had they not been uncovered," "is not sufficient to allege open-ended continuity").

Here, the entirety of the alleged racketeering activity set forth in the complaint encompasses a scheme which has "a clear and terminable goal" and therefore which has "a natural ending point." *Daedalus Capital LLC v. Vinecombe*, 625 Fed. App'x 973, 977 (11th Cir. 2015) (quoting *Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 782 (7th Cir.1994)). As mentioned above, MasTec identifies this very endpoint in the opening paragraph of its complaint: April 2019, when Puerto Rico's electric grid had been fully restored. Although MasTec recounts in its response that Tribble had a close personal relationship with Ellison and maintained a leadership role at FEMA (*e.g.*, Pl.'s Resp. at 10), there is no allegation in the complaint that the two, through whom the enterprise conducted its scheme, maintained a relationship of any kind, after the conclusion of the restoration. Similarly, MasTec's reliance on Tribble's funneling of work to Cobra that fell outside the scope of second request for proposals (*e.g.*, Pl.'s Resp. at 10) is equally unavailing: these "outside" projects remained confined to the restoration work, funded by FEMA, as a result of Hurricane Maria. In sum, the Court finds no support in the complaint that there was a threat of continuity of the racketeering activity. *See Daedalus*, 625 Fed. App'x at 977 (finding no threat that the alleged pattern of racketeering activity would continue into the future because the goal of the enterprise had been realized and there was "no longer a working relationship" that would provide an "opportunity for [the d]efendants' pattern of predicate acts to persist into the future"); *Ferrell v. Durbin*, 311 Fed. App'x 253, 257 (11th Cir. 2009) ("[I]t is clear that single schemes with a specific objective and a natural ending point can almost never present a threat of continuing racketeering activity."); *Thompson v. Paasche,* 950 F.2d 306, 311 (6th Cir.1991) (concluding that a fraudulent scheme to sell nineteen plots of land was "an inherently short-term affair" that was, "by its very nature, insufficiently protracted to qualify as a RICO violation").

Nor is MasTec's contention that "hurricanes, earthquakes, and other events under FEMA's purview are routine occurrences in Tribble's jurisdiction" (Pl.'s Resp. at 25) availing. First, this allegation appears nowhere in the complaint. And, even if it did, it would be pure speculation: certainly, there *could be,* and no doubt will be, another natural disaster, affecting an area's electric

grid, next week, next year, or decades from now. But when and where the next disaster will occur is pure conjecture and, then, whether such a disaster would have resurrected the racketeering activities alleged is, further still, pure guesswork.

  MasTec also looks to several cases that stand for the proposition that a "lack of a threat of continuity of racketeering activity cannot be asserted merely by showing a fortuitous interruption of that activity such as by an arrest, indictment or guilty verdict" to support its position. *United States v. Busacca*, 936 F.2d 232, 238 (6th Cir. 1991); *Abraham v. Singh*, 480 F.3d 351, 356 (5th Cir. 2007) (finding continuity where "there [wa]s no reason to suppose that [the defendants'] systematic victimization allegedly begun [years earlier] would not have continued indefinitely had the [p]laintiffs not filed th[eir] lawsuit"); *Allwaste, Inc. v. Hecht*, 65 F.3d 1523, 1530 (9th Cir. 1995) (noting that the "[d]efendant[s'] willingness to participate in the kickback scheme and their affirmative misrepresentations . . . demonstrate[d] that if they had not been fortuitously interrupted by termination, the predicate acts could have recurred indefinitely"); *United States v. Alexander*, 888 F.2d 777, 778 (11th Cir. 1989) (finding that, where a defendant had "extorted, or conspired to extort, money each year that he held office from 1977 to 1984," there was a "sufficient likelihood that[,] had [he] continued as a board member, he would have also continued these sorts of activities"); *Molinos Valle del Cibao, C. por A. v. Lama*, 07-23066-CIV, 2008 WL 11333583, at *3 (S.D. Fla. Oct. 17, 2008) (Simonton, Mag. J.) (finding some support for a RICO claim where the facts showed defendants were committing fraudulent "acts as a regular way of conducting their business and, if that activity had not been discontinued as a result of [the defendants'] decision to flee the Dominican Republic to avoid their creditors, it would have continued indefinitely"), *rep. and recommendation adopted,* 07-23066-CIV, 2008 WL 11333585 (S.D. Fla. Oct. 31, 2008) (Ungaro, J.). MasTec's reliance on these cases misses the mark. In each case, the alleged racketeering activity was found to have been interrupted only by a discovery of the defendants' schemes or the filing of a lawsuit. Here, by contrast, there was a natural end to the enterprise's scheme long before any of it was discovered. The last incident MasTec alleges that is indicative of Ellison's bribery of Tribble occurred in December 2018, when the two exchanged text messages regarding Tribble's use of Ellison's credit card for her travel expenses. (Compl. ¶ 71 n.7.) This was nearly three months before the completion of the restoration of the grid and nearly nine months before Tribble, Ellison, and Patterson were arrested. Although the scope of the scheme here was indeed breathtaking and particularly nefarious, considering the involvement of public funds and the destruction and suffering caused by a historic disaster, the totality of the circumstances, as alleged in the complaint,

does not depict, or even imply, a threat of continuing criminal activity. Instead, what is revealed by the complaint is an opportunistic scheme, aimed at taking advantage of a natural disaster and the limited, though vast, federal funds made available in its wake.

There are simply no allegations here that support the notion that the alleged criminal activity was part of the enterprise's regular way of doing business or that the enterprise intended to continue to seek out similar opportunities to which it could apply its malfeasance. *Jackson*, 372 F.3d at 1267 (noting that even "predicate acts occurring over three year period [are] insufficient to allege pattern of racketeering when [the] complaint alleged a single scheme with a single goal) (citing *Edmondson & Gallagher v. Alban Towers Tenants Ass'n*, 48 F.3d 1260, 1265 (D.C.Cir.1995)). The scheme alleged here began, at the earliest, when federal funds became available for the restoration of Puerto Rico's electric grid and ended, at the latest, when the restoration was complete and the funds had been expended. MasTec, therefore, has failed to state a claim for a RICO violation. Accordingly, the Court grants the Defendants' motions to dismiss both MasTec's substantive RICO claim, under 18 U.S.C. § 1962(c) (count one), and MasTec's conspiracy claim, under § 1962(d) (count two), which is premised upon the substantive claim.

### B. Subject-matter jurisdiction

Upon a review of the record in this case, in light of the dismissal of MasTec's federal claims, the Court is unable to ascertain whether it retains subject-matter jurisdiction over this case. Although MasTec maintains "there exists complete diversity" (Compl. ¶ 20), the Court finds MasTec's citizenship allegations lacking.

A party seeking to invoke a federal court's diversity jurisdiction must allege "facts" showing federal subject matter jurisdiction exists. *Travaglio v. Am. Express Co.*, 735 F.3d 1266, 1268 (11th Cir. 2013). "Those allegations, when federal jurisdiction is invoked based upon diversity, must include the citizenship of each party, so that the court is satisfied that no plaintiff is a citizen of the same state as any defendant." *Id.*

Further, in the Eleventh Circuit, the citizenship of a limited liability company is determined, for diversity purposes, by the citizenship of all the members composing the entity. *Rolling Greens MHP v. Comcast SCH Holdings, LLC*, 374 F.3d 1020, 1021–22 (11th Cir. 2004). A limited liability company is a citizen of any state of which a member is a citizen. *Id.* at 1022. To sufficiently allege the citizenship of a limited liability company, a party must list all the members of the limited liability company along with each member's citizenship. *Id.* Here, two of the parties are limited liability companies: MasTec and Cobra.

The complaint states both are wholly-owned subsidiaries: MasTec of MasTec, Inc. (Compl. ¶ 13); and Cobra of Mammoth (*id.* ¶ 16). But allegations that these two entities are wholly-owned subsidiaries does not necessarily "permit the court to conclude that plaintiff and defendants are diverse for purposes of subject matter jurisdiction, because it is membership, not ownership, that is critical for determining the citizenship of an LLC." *Post v. Biomet, Inc.*, 3:20-CV-527-J-34JRK, 2020 WL 2766210, at *1 (M.D. Fla. May 28, 2020) (cleaned up). And while the Court "acknowledges that the terms 'owner' and 'member' have sometimes been used synonymously with respect to limited liability companies," the "terms are not always interchangeable." *Id.* The Court is, therefore, unsure whether, (1) in addition to owning the subsidiaries, the parent companies are also members, or (2) despite being "wholly owned," there are necessarily no other members. Accordingly, the Court cannot assume that MasTec's allegations regarding ownership necessarily establish sole membership or even membership. Additionally, even if MasTec, Inc., is indeed MasTec's sole member, the complaint fails to set forth MasTec, Inc.'s citizenship, further preventing the Court from discerning MasTec's citizenship. If MasTec is unable to establish the Court's subject-matter jurisdiction to consider the remaining, non-federal claims in this case, the Court will dismiss those claims, albeit without prejudice. On the other hand, if MasTec does establish subject-matter jurisdiction, the Court will evaluate the remainder of the Defendants' motions to dismiss at that time.

### 4. Conclusion

For the reasons set forth above, the **grants** the Defendants' motions to dismiss, **in part**, and **defers consideration** of the remainder of those motions, in light of questions relating to the Court's subject-matter jurisdiction (**ECF No. 16, 17**). The Court **dismisses** MasTec's RICO claims (**counts one and two**), **with prejudice** because MasTec has failed to state a claim under Rule 12(b)(6). Further, the Court **denies** MasTec's request for **leave to amend**, inserted as an afterthought, in a footnote, at the conclusion of its forty-page opposition to the Defendants' motions to dismiss: the request is both procedurally defective and lacking in substantive support. *See Newton v. Duke Energy Florida, LLC,* 895 F.3d 1270, 1277 (11th Cir. 2018) ("[W]here a request for leave to file an amended complaint simply is imbedded within an opposition memorandum, the issue has not been raised properly."); *Avena v. Imperial Salon & Spa, Inc.*, 740 Fed. App'x 679, 683 (11th Cir. 2018) ("[W]e've rejected the idea that a party can await a ruling on a motion to dismiss before filing a motion for leave to amend.") (noting also that "a motion for leave to amend should either set forth the substance of the proposed amendment or attach a copy of the proposed amendment") (cleaned up).

On the other hand, the Court defers consideration of the Defendants' motions to dismiss the remainder of MasTec's complaint: that is, counts three and four. Because the Court is unable to ascertain whether complete diversity exists, the Court orders MasTec to submit a statement, setting forth the facts necessary to establish jurisdiction **on or before October 23, 2020**. If MasTec fails to comply by this date or fails to provide the facts necessary to establish the Court's subject-matter jurisdiction, the Court will dismiss the remaining counts of MasTec's complaint, without prejudice. If the Court finds it indeed has subject-matter jurisdiction over the remaining claims, the Court will then consider the remainder of the Defendants motions to dismiss.

**Done and ordered**, at Miami, Florida, on October 14, 2020.

_____
Robert N. Scola, Jr.
United States District Judge