United States District Court
for the
Southern District of Florida

| | | |
|---|---|---|
| MasTec Renewables Puerto Rico LLC, Plaintiff, | ) ) ) | |
| v. | ) ) ) | Civil Action No. 20-20263-Civ-Scola |
| Mammoth Energy Services, Inc. and Cobra Acquisitions, LLC, Defendants. | ) ) ) | |

**Order Denying in Part and Granting in Part
the Remainder of the Motions to Dismiss**

Plaintiff MasTec Renewables Puerto Rico LLC ("MasTec") seeks to recover damages from Defendants Mammoth Energy Services, Inc. ("Mammoth") and Cobra Acquisitions, LLC ("Cobra") for projects it says the Defendants diverted to themselves, and away from MasTec, through a bribery scheme involving a Federal Emergency Management Administration official in the wake of Hurricane Maria in 2017. (Compl., ECF No. 1.) In its complaint, MasTec sets forth claims (1) under the federal Racketeer Influenced and Corrupt Organizations Act (counts one and two), (2) for tortious interference (count three), and (3) for violations of section 5141 of Title 31 of the Laws of Puerto Rico Annotated (count four). (*Id.* ¶ 11.) Both Defendants have filed motions to dismiss the complaint in which they argue MasTec fails to state claims for relief under RICO, for tortious interference, or for a violation of Puerto Rican law. (Cobra's Mot., ECF No. 17, 12–18, 20–23; Mammoth's Mot., ECF No. 16, 7–10, 11–12.) Both Defendants also maintain the complaint should be dismissed for a lack of personal jurisdiction. (Cobra's Mot. at 12; Mammoth's Mot. at 10–11.) Additionally, both Defendants contend MasTec has failed to plead proximate cause as to the damages it claims as a result of its mobilization costs. (Cobra's Mot. at 22–23; Mammoth's Mot. at 12.) Lastly, Mammoth contends MasTec's claims fail against it for the additional reason that MasTec does not adequately plead that Mammoth is an alter ego of Cobra. (Mammoth's Mot. at 13–16.)

Previously, the Court granted the Defendants' motions, in part, as to MasTec's RICO claims. (Order, ECF No. 45.) Once the federal claims were dismissed, the Court determined MasTec's subject-matter jurisdiction allegations were deficient. Consequently, the Court ordered MasTec to set forth facts that would assure the Court of its jurisdiction. (Order at 12.) MasTec timely complied (Pl.'s Stmt., ECF No. 46) and the Court is satisfied that it has diversity jurisdiction over this case. As such, it has now considered the remainder of the

Defendants' motions to dismiss. Based on that review, the Court **grants** the remainder of Mammoth's motion to dismiss (**ECF 16**), dismissing MasTec's claims against Mammoth, without prejudice, based on a lack of jurisdiction, and **grants in part and denies in part** the remainder of Cobra's motion to dismiss (**ECF No. 17**), as more fully explained below.

### 1. Background and Facts[1]

Hurricane Maria made landfall in Puerto Rico as a Category 4 storm on September 20, 2017. (Compl. ¶ 1.) The storm wiped out the island's electricity, destroyed much of its infrastructure, and ultimately caused the deaths of more than 3,000 people. (*Id.*) Just two weeks earlier, another storm, Hurricane Irma, had already left about two-thirds of the island without electricity. (*Id.* ¶ 25.) On the day Hurricane Maria hit Puerto Rico, the president of the United States issued a major disaster declaration, authorizing FEMA to allocate such available disaster-relief funds as were necessary to provide disaster assistance and to cover related administrative expenses. (*Id.* ¶ 26.) The Puerto Rico Electric Power Authority ("PREPA") triggered an emergency protocol and began searching for private contractors to immediately begin work to restore the island's power. (*Id.*)

On October 13, less than a month after the storm, PREPA notified MasTec—an infrastructure construction company that specializes, among other things, in the emergency restoration of electrical power after natural disasters— that it was being considered as a potential contractor. (*Id.* ¶¶ 13, 27.) Less than a week later, however, PREPA executed its first "Emergency Master Services Agreement" with Cobra. (*Id.* ¶ 29.) Cobra, in stark comparison to MasTec, was new to large-scale electric infrastructure restoration, having been just recently formed by its parent, Mammoth, itself an oilfield-services and fossil-fuel company, just months earlier. (*Id.*) Cobra was Mammoth's first foray into the energy infrastructure business. (*Id.*) Mammoth's CEO and director, Arty Straehla, negotiated and executed this initial contract on Cobra's behalf. (*Id.* ¶¶ 29, 92.) The contract, in its initial form, provided for a one-year term and a maximum compensation to Cobra of $200 million, with a $15 million deposit due upon execution. (*Id.* ¶ 30.) FEMA reviewed this contract, approving it and committing $200 million in public funds for the costs of the initial contract. (*Id.* ¶ 31.) This initial contract later evolved, and, after five amendments, by February 27, 2018, Cobra's maximum compensation was increased to $945,429,800, which FEMA also approved. (*Id.* ¶ 33.)

---

[1] The Court accepts MasTec's factual allegations as true for the purposes of evaluating the Defendants' motions to dismiss. *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997).

In the meantime, in addition to PREPA's first contract with Cobra, PREPA issued a second request for proposals, on February 16, 2018, seeking more bids from electrical contractors to continue to rebuild and restore Puerto Rico's electric grid. (*Id.* ¶¶ 26, 34.) After considering this second round of bids, PREPA awarded two more contracts: another contract with Cobra, allowing up to $900 million in compensation; and a contract with MasTec, providing for a maximum of $500 million in compensation. (*Id.* ¶ 3.) Both contracts, executed in May 2018, were for a term of one year. (*Id.* ¶ 41.) These contracts covered "the $1.4 billion allotted to FEMA for its recovery efforts in Puerto Rico." (*Id.* ¶ 3)

After being awarded the $500-million-maximum-compensation contract, MasTec immediately began mobilizing, as it disclosed it would in its proposal to PREPA, initiating the transport of equipment, materials, construction supervision, craft labor, and MasTec's project management team for deployment to Puerto Rico. (*Id.* ¶¶ 4, 37, 43.) In initiating this massive mobilization effort, MasTec incurred over $15 million in expenses. (*Id.* ¶¶ 4, 46.)

Months earlier, however, Asha Nateef Tribble, FEMA's Deputy Regional Administrator for Region II—serving New Jersey, New York, Puerto Rico, and the U.S. Virgin Islands—had begun, although it's not clear exactly when, accepting bribes from Donald Keith Ellison, Cobra's president. (*Id.* ¶ 47.) In providing these bribes, Ellison sought to, and did, induce Tribble into diverting all restoration work to Cobra, to MasTec's detriment. (*Id.* ¶ 1, 5–7, 17.) Ellison's bribes took many forms: hotel accommodations in New York (from January 31 through February 2, 2018), in Fort Lauderdale (from July 17 to 18, 2018), and in North Carolina (from November 29 to 30, 2018); a helicopter tour of Puerto Rico in February 2018; plane tickets for travel from Miami to Orlando (on July 20, 2018), from San Juan to New York (first class, on September 22, 2018), and from Washington, D.C. to Charlotte, North Carolina, roundtrip (on November 29 and 30, 2018); personal security services in November and December 2018; use of an apartment in San Juan, Puerto Rico; assistance, in February 2018, with securing an apartment in New York City; and access to Ellison's personal credit card for Tribble's own use, extending at least into December 2018. (*Id.* ¶¶ 7, 66, 69–71.) Additionally, in March 2018, Tribble contacted Ellison about securing a job at Cobra, or a Cobra affiliate, for her friend, Jovanda Patterson. (*Id.* ¶¶ 48, 67.) Just over a month later, on June 1, 2018, a Cobra affiliate, at Ellison's prompting, it appears, offered Patterson a lucrative position, more than doubling her current salary at FEMA. (*Id.* ¶¶ 48, 67, 68.) Six days later, PREPA sent MasTec a notice of suspension of work, directing MasTec, without any reason, to stop any work under its contract, including its mobilization efforts. (*Id.* ¶ 49.) Despite the suspension, a PREPA representative assured MasTec the suspension would be brief, and a new start date would issue soon. (*Id.*)

The day after the suspension notice issued, and unbeknownst to MasTec at the time, Tribble and Ellison were exchanging emails through their personal accounts, about meeting at a hotel and discussing Tribble's upcoming travel plans. (*Id.* ¶ 50.) In the meantime, believing further delays would be brief and that funding for its work under the contract would be secured, MasTec, on June 14, 2018, began actually shipping equipment and supplies from West Palm Beach to Puerto Rico. (*Id.* ¶ 52.) The anticipated work for MasTec, though, never materialized. Despite assurances and excuses from Tribble during meetings with FEMA, PREPA, MasTec, and Cobra in July and August 2018 and with FEMA, PREPA, and MasTec in January 2019, MasTec remained sidelined while PREPA routinely assigned project after project exclusively to Cobra. (*Id.* ¶ 54, 58–59, 62.)

While MasTec was strung along by FEMA, through Tribble or her reports, who blamed PREPA for failing to assign any work to MasTec, Tribble and Ellison were in constant communication, often through their personal cell phone and email accounts. (*Id.* ¶ 67.) As early as December 2017, Tribble, in exchange for bribes from Ellison, shared critical insider information and confidential documents (including, it appears, MasTec's own proprietary information), and the status of Hurricane Maria restoration projects in Puerto Rico. (*Id.* ¶¶ 72–75.) Throughout their communications, Ellison and Tribble also plotted to manufacture restoration-work opportunities that could be funneled to Cobra and used to bolster Tribble's reputation within FEMA, by having her take credit for various projects. (*Id.* ¶ 76.) For example, in March and April 2018, Tribble and Ellison coordinated a workplan that would result in Cobra's involvement in a redesign and "hardening" of the distribution system in Vieques, a small island-municipality off the east coast of Puerto Rico. (*Id.* ¶ 77.) Tribble, based on documents prepared by Cobra and provided by Ellison, proposed the system redesign to FEMA and PREPA officials. (*Id.* ¶ 78.) In the process, Tribble shared FEMA documents marked for "Official Use Only" with Ellison. (*Id.* ¶ 80.) While orchestrating work for Cobra on Vieques (and another island municipality, Culebra), and other behind-the-scenes maneuverings, Tribble also sought, from March through November 2018, to manufacture restoration work for Cobra at the Roosevelt Roads Naval Station. (*Id.* ¶ 84, 85.) While the restoration of Puerto Rico's electric grid was finally completed in April 2019, MasTec never received a single work order or any compensation whatsoever arising out of its $500 million contract. (*Id.* ¶¶ 1, 5.) In the end, throughout the months of Tribble and Ellison's secret communications and scheming, Tribble, as MasTec describes it, "lied to MasTec, strung MasTec along, and kept MasTec—like the people of Puerto Rico—in the dark." (*Id.* ¶ 87.)

Eventually, as a result of their scheme, Tribble and Ellison, on September 10, 2019, were indicted, along with Patterson, by a federal grand jury in the District of Puerto Rico. (*Id.* ¶ 64.) The indictment included fifteen counts, among them counts for conspiracy to commit bribery, honest-services wire fraud, disaster fraud, and wire fraud. (*Id.*) As a result of Tribble and Ellison's scheming, Cobra and Mammoth received over $1.1 billion in FEMA payments for their purported work in restoring Puerto Rico's electric grid. (*Id.* ¶ 5, 88.)

## 2. **Legal Standard**
### A. **Rule 12(b)(6)**

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court must accept all the complaint's allegations as true, construing them in the light most favorable to the plaintiff. *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008). A pleading must only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A motion to dismiss under Rule 12(b)(6) challenges the legal sufficiency of a complaint. *See* Fed. R. Civ. P. 12(b)(6). In assessing the legal sufficiency of a complaint's allegations, the Court is bound to apply the pleading standard articulated in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). That is, the complaint "must . . . contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1289 (11th Cir. 2010) (quoting *Twombly*, 550 U.S. at 570). "Dismissal is therefore permitted when on the basis of a dispositive issue of law, no construction of the factual allegations will support the cause of action." *Glover v. Liggett Grp., Inc.*, 459 F.3d 1304, 1308 (11th Cir. 2006) (internal quotations omitted) (citing *Marshall Cnty. Bd. of Educ. v. Marshall Cnty. Gas Dist.*, 992 F.2d 1171, 1174 (11th Cir. 1993). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* A court must dismiss a plaintiff's claims if he fails to nudge his "claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

Thus, a pleading that offers mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" will not survive dismissal. *See id.* at 555. "Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 679.

### B. Personal Jurisdiction

Federal Rule of Civil Procedure 12(b)(2) governs motions to dismiss for lack of personal jurisdiction. "Whether the court has personal jurisdiction over a defendant is governed by a two-part analysis." *Verizon Trademark Servs., LLC v. Producers, Inc.*, 810 F. Supp. 2d 1321, 1324 (M.D. Fla. 2011). First, the court must determine whether the applicable state long-arm statute is satisfied. *Future Tech. Today, Inc. v. OSF Healthcare Sys.*, 218 F.3d 1247, 1249 (11th Cir. 2000). Second, if the state long-arm statute is satisfied, the court must analyze "whether the exercise of jurisdiction over the defendant comports with the Constitution's requirements of due process and traditional notions of fair play and substantial justice." *Verizon Trademark*, 810 F. Supp. 2d at 1324; *Sculptchair, Inc. v. Century Arts*, 94 F.3d 623, 626 (11th Cir. 1996).

### 3. Discussion

### A. Rule 12(b)(6) Analysis

The Defendants maintain (a) MasTec has failed to state a claim for tortious interference because MasTec has not alleged facts showing that either Cobra or Mammoth themselves participated in the relevant misconduct; (b) MasTec has not alleged that the Defendants induced PREPA to breach its contract with MasTec; (c) MasTec has failed to plead proximate cause as to its damages arising from its unreimbursed mobilization costs; and (d) MasTec has failed to plead a claim under 31 L.P.R.A. § 5141. (Cobra's Mot. at 20–23; Mammoth's Mot. at 11–12.) MasTec, in opposition, (a) points to the allegations in the complaint showing that Cobra acted through Ellison and that Cobra, in turn, was acting as Mammoth's alter ego or agent; (b) maintains if, on the one hand, Puerto Rico law applies, MasTec need not allege a breach of contract; or, if Florida law applies, MasTec has alleged a claim for tortious interference with a business relationship, which also does not require alleging a breach of contract; (c) insists the "Defendants should have foreseen that MasTec might incur lost expenses"; and (d) argues it can plead a general claim for wrongdoing under § 5141. (Pl.'s Resp. at 36–37, 39–41.) After careful review, the Court agrees with MasTec that it has sufficiently alleged Cobra's direct involvement in the misconduct but finds MasTec has not made an adequate showing that Cobra is Mammoth's alter ego. The Court also disagrees that Puerto Rica law applies but, nonetheless, finds MasTec has sufficiently alleged a claim for tortious interference with a business relationship against Cobra. Further, the Court agrees with the Defendants that MasTec has failed to plead the Defendants' liability regarding MasTec's mobilization costs. And, lastly, the Court finds MasTec cannot proceed with its claim under § 5141.

**(1) The Defendants' Participation in the Alleged Misconduct**

First, with respect to Cobra's participation in the alleged misconduct, MasTec has sufficiently pleaded Cobra's direct involvement. MasTec defines Defendant Cobra Acquisitions, LLC, as "Cobra" and alleges, pointedly, that Cobra, through its president, Ellison, coordinated with Tribble, Patterson, and others to provide specific things of value in exchange for getting work assigned to Cobra and for inside information. (Compl. at 3, ¶¶ 6–9, 17, 47–48, 50–51, 53, 62, 65–73, 75–83, 85–87, 89, 91, 96.) MasTec also alleges Ellison took the lead in manufacturing projects for Cobra, drafting proposals and otherwise coordinating with Tribble to create additional work for his companies. (*Id.* ¶¶ 77–85.) Based on his position within the corporation, Ellison's knowledge and actions are imputed to Cobra as a matter of law. *See Dye v. Tamko Bldg. Products, Inc.*, 908 F.3d 675, 685 (11th Cir. 2018) ("[I]t is axiomatic under Florida law—and more generally—that knowledge or notice that an agent acquires while acting within the course and scope of his authority is generally imputed to his principal."); *In re Kapila*, 762 Fed. App'x 991, 994 (11th Cir. 2019) ("Under Florida law . . . wrongdoing by a corporate officer is imputed to the company so long as the officer acts within the scope of his employment.") ("[A]n officer who acts to further the interests of the corporation necessarily is acting within the scope of his employment.").

Regarding MasTec's contention that Mammoth can be held liable for Cobra's misconduct, however, the Court finds the complaint's allegations lacking. Under Florida law, in order "to pierce the corporate veil and hold a parent corporation liable for its subsidiary's actions," a plaintiff must "demonstrate first, that the subsidiary was a mere instrumentality of the parent, and second, that the parent engaged in improper conduct through its organization or use of the subsidiary." *SEB S.A. v. Sunbeam Corp.*, 148 Fed. App'x 774, 800 (11th Cir. 2005) (cleaned up).

To be sure, MasTec has presented a wealth of facts showing that the lines between the two corporations were certainly blurred: Cobra and Mammoth's principal places of business were at the same address; the companies also share a web address and telephone number; Ellison, Cobra's sole representative, had an email address ending in @mammothenergy.com; Mammoth made decisions on behalf of Cobra, with Mammoth CEO Arty Straehla—who appears to have held no official role with Cobra—signing several contracts between Cobra and PREPA; Straehla negotiated, on Cobra's behalf, the first contract with PREPA; in a January 2017 Mammoth press release, Straehla announced that the company was "honored to be chosen to help restore the electrical utility infrastructure for the residents of Puerto Rico" and that the Cobra contract "will be instrumental to

Mammoth's existing energy service operations"; when asked for comment on a news article about the PREPA contract, Ellison "deferred official comment on specific contractual language to Mammoth representatives"; Mammoth's 2019 financials reflect $227 million in outstanding receivables from PREPA; and Mammoth CFO Mark Layton traveled to Puerto Rico, in March 2019, to collect funds owed by PREPA. (Compl. ¶¶ 92–97.)

     In contrast, however, the only allegations supplied to show that Mammoth "engaged in improper conduct through its organization or use of the subsidiary" are conclusory, bereft of factual support, and borne of speculation. For example, without support, MasTec, in its complaint sets forth the naked assertions that "Mammoth . . . had actual knowledge of . . . the wrongful acts of [Cobra and Ellison]," "ratified, approved, joined in, acquiesced, or authorized th[ose] wrongful acts," and "used Cobra for a fraudulent purpose." (*Id.* ¶¶ 90, 94.) Similarly, MasTec provides that "Cobra's corporate existence . . . has . . . been devoted nearly exclusively to perpetrating a fraud for Mammoth's financial benefit." (*Id.* ¶ 94.) To support these bald assertions, MasTec relies on only the following facts: "Cobra was formed in the second quarter of 2017, just months before Hurricane Maria made landfall in Puerto Rico"; and once the storm hit, "Mammoth's CEO immediately put Cobra forward for emergency restoration work in Puerto Rico and negotiated the [f]irst Cobra [c]ontract"; and Cobra has received "approximately $1.1 billion in federal funds for its work in Puerto Rico." (*Id.* ¶ 94.) None of these facts, though, show that Mammoth itself engaged in actual improper conduct through either its organization or use of Cobra. *See Century Sr. Services v. Consumer Health Ben. Ass'n, Inc.*, 770 F. Supp. 2d 1261, 1266 (S.D. Fla. 2011) (Martinez, J.) (finding support to pierce the corporate veil where the plaintiff has sufficiently alleged "that [the parent] used [the subsidiary] for a fraudulent purpose by using it to mislead creditors and to shield [the parent] from liability for conversion and theft") (Martinez, J.); *Eckhardt v. United States*, 08-21791-CIV, 2010 WL 11504339, at *5 (S.D. Fla. July 8, 2010) (Gold, J.), *aff'd,* 463 Fed. App'x 852 (11th Cir. 2012) (finding alter-ego liability where, both, (1) an individual completely dominated and controlled a corporate entity, and (2) the corporate entity was used for an improper purpose—shielding the individual from tax liability). Fatal to its claim that Cobra is Mammoth's alter ego, MasTec fails to provide any link between Mammoth's formation and use of Cobra, on the one hand, and its allegations of wrongdoing, on the other. In sum, MasTec fails to nudge its claims regarding Mammoth's improper use of Cobra beyond merely conceivable to actually plausible.

     Similarly, MasTec has also failed to plead that Cobra was acting as Mammoth's agent. As MasTec points out, a parent company's liability can be established under an "agency theory where the parent corporation uses a

subsidiary to do its bidding." (Pl.'s Resp. at 41 (quoting *In re Managed Care Litig.*, 298 F. Supp. 2d 1259, 1309 (S.D. Fla. 2003) (Moreno, J.)).) "The elements of agency under Florida law are (1) acknowledgment by the principal that the agent will act for it, (2) the agent's acceptance of the undertaking, and (3) control by the principal over the actions of the agent." *Gregory v. EBF & Associates, L.P.*, 595 F. Supp. 2d 1334, 1340 (S.D. Fla. 2009) (Martinez, J.) (citing *State of Florida v. American Tobacco Co.,* 707 So. 2d 851, 854 (Fla. 4th DCA 1998). In support of its allegations of agency, MasTec points specifically to Mammoth's CEO's negotiating and signing, on Cobra's behalf, the contracts with PREPA; Ellison's deferring questions about Cobra's contracts to Mammoth; Mammoth's collecting compensation under the Cobra contracts; and Mammoth's CFO's efforts to collect that compensation from PREPA. While these facts certainly show exceedingly close ties between Mammoth and Cobra and that Mammoth appeared to assert some—although not total or even necessarily significant—control over Cobra, MasTec has not shown that Mammoth ever acknowledged that Cobra would be acting on Mammoth's behalf or that Cobra ever accepted that undertaking. And, certainly, MasTec did not supply any facts showing that Mammoth directed any aspect of the bribery scheme. In sum, the Court finds MasTec has failed to show that Mammoth can be held liable for Cobra's misconduct.

### (2) Choice of Law

Next, the Court disagrees with MasTec that Puerto Rico law applies to this case. Florida choice-of-law rules determine what law applies to MasTec's tortious interference claims. *Grupo Televisa, S.A. v. Telemundo Communications Group, Inc.*, 485 F.3d 1233, 1240 (11th Cir. 2007) ("A federal court sitting in diversity will apply the conflict-of-laws rules of the forum state."). And "Florida resolves conflict-of-laws questions according to the most significant relationship test outline in the Restatement (Second) of Conflict of Laws." *Grupo*, 485 F.3d at 1240. Under this test, four types of contacts are evaluated: "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered." *Id.* (quoting RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145 (1971)). The first contact type—where the injury occurred—"is generally the most important, as absent special circumstances, the state where the injury occurred would be the decisive consideration in determining the applicable choice of law." *Melton v. Century Arms, Inc.*, 243 F. Supp. 3d 1290, 1299 (S.D. Fla. 2017) (Moreno, J.) (cleaned up). "Choice of the applicable law," however, "becomes more difficult in situations where the defendant's conduct and the

resulting injury occurred in different states." RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145 (1971).

To begin with, MasTec concedes that the place of injury is in Florida, where MasTec is headquartered. (Pl's Resp. at 32 ("[T]he Defendants' interference with MasTec's [contract] injured MasTec in Florida."); 35 ("MasTec suffered losses primarily at its principal place of business.").) The first factor, then, weighs heavily in favor of Florida law.

As to the second factor, the wrongful conduct alleged—that is, interfering with MasTec's PREPA contract "by giving things of value to Tribble in exchange for inside information and valuable work assignments"—occurred in multiple locations: New York, Florida, North Carolina, Puerto Rico are among the locations mentioned in the complaint. The Court disagrees with MasTec's contention that this factor favors Puerto Rico because "the bulk of the tortious conduct that caused MasTec's losses focused on Puerto Rico—the restoration work was based there, and each of Defendants' wrongful act was aimed at disrupting the regular flow of business there." (*Id.* at 35.) Where some results of the wrongful conduct manifested, however, is not the same as where the wrongful conduct itself occurred. Further, MasTec conflates Tribble's wrongful conduct with the Defendants' wrongful conduct. While *Tribble's conduct* certainly has a direct link to PREPA's funneling of work to Cobra, in Puerto Rico, the conduct at issue here—Ellison's part in the bribery scheme—is not so direct. On balance then, the Court finds this factor neutral or, at most, only slightly in favor of Puerto Rico law.

As to the third factor—domicile, residence, nationality, place of incorporation and place of business of the parties—the Court finds a significant relationship to Florida as this is where MasTec is headquartered. And while MasTec's formation and organization in Puerto Rico counts for something, that is somewhat outweighed by the location of MasTec's principal place of business. *See* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145 (1971) (Cmt. e.) (noting "a corporation's principal place of business is a more important contact than the place of incorporation"). This factor has added significance since Florida is where MasTec acknowledges it suffered its injury. *See id.* ("The state where these [third-factor] contacts are grouped is particularly likely to be the state of the applicable law if either the defendant's conduct or the plaintiff's injury occurred there.") Of note, neither Defendant is incorporated or headquartered in either Florida or Puerto Rico.

Finally, regarding the fourth factor, MasTec maintains its relationship with the Defendants is centered in Puerto Rico. In support, MasTec acknowledges that it is connected to the Defendants only through their respective contracts with PREPA, both borne out of PREPA's February 2018 request for proposals.

(Pl.'s Resp. at 36.) MasTec then explains that, under those contracts, the "Defendants and MasTec remained in Puerto Rico, met with FEMA and PREPA, and competed for restoration work and FEMA funds." (*Id.*) The Court does not find this to show much of a relationship between MasTec and the Defendants, if at all. Instead, what MasTec has identified are relationships between MasTec and PREPA, on the one hand, and the Defendants and PREPA, on the other. Regardless, even if what MasTec describes does amount to relationship between the parties, it is not a significant enough contact with Puerto Rico to outweigh the substantial contacts the Court finds that establish a more significant relationship with Florida. Ultimately, the choice-of-law analysis comes out in favor of applying Florida law in order to evaluate MasTec's claim for tortious interference.

### (3) Tortious Interference Under Florida Law

In arguing MasTec has failed to state a claim for tortious interference, Cobra insists MasTec has attempted to allege only a claim for tortious interference with a contract, as opposed to a claim for tortious interference with a business relationship. Accordingly, submits Cobra, MasTec's claim fails because the complaint does not include an allegation, as it must under Florida law, that Cobra's misconduct induced PREPA to breach its contract with MasTec. (*E.g.*, Cobra's Mot. at 20–21.) While the Court has no quarrel with Cobra's statement of the law, the Court disagrees with Cobra's technical and overly narrow characterization of MasTec's claim for tortious interference.

Under Florida law, "tortious interference with a business relationship requires proof of . . . three elements: (1) The existence of a business relationship under which the plaintiff has legal rights; (2) an intentional and unjustified interference with the relationship by the defendant; and (3) damage to the plaintiff as a result of the tortious interference with the relationship." *Gregg v. U.S. Indus., Inc.*, 887 F.2d 1462, 1473 (11th Cir. 1989) (cleaned up). Cobra's fixation on MasTec's allegations that the "Defendants interfered with the MasTec [contract]" is misplaced. (Cobra's Reply at 14 (citing Compl. ¶¶ 118, 119).) Instead, the Court finds the contract in this case demonstrative and illustrative of the business relationship between PREPA and MasTec which MasTec alleges Cobra interfered with.

The parties appear to agree that, under Florida law, MasTec has failed to plead a claim for tortious interference with a contract. Cobra's further argument, however, that that is the only tortious-interference claim presented in MasTec's complaint fails to persuade. MasTec's reliance on the contract to set forth the contours of its business relationship with PREPA does not result in MasTec's being limited to proceeding only under a theory of interference with a contract.

This is especially so where MasTec labeled count three, simply, "Tortious Interference."[2] (Compl. at 33.) Thus, as the parties agree, MasTec has failed to state a claim for tortious interference with a contract under Florida law. Conversely, the Court does not agree with Cobra's position that this is the only tortious interference claim that can be construed from the facts alleged. Instead, the Court finds that, accepting all the complaint's allegations as true, and construing them in the light most favorable to MasTec, MasTec has stated a claim for tortious interference with a business relationship against Cobra.

### (4) Mobilization Costs

MasTec insists the mobilization costs that PREPA has not reimbursed "were an entirely foreseeable consequence of [the] Defendants' scheme." (Pl.'s Resp. at 37.) After review, though, the Court agrees with Cobra that the complaint is devoid of allegations that support MasTec's position. There are simply no factual allegations that Cobra, or even FEMA, had any role in PREPA's failure to reimburse MasTec for these expenses. That is, MasTec's allegations focus on the Defendants' wrongdoing that led FEMA, through PREPA, to steer work to Cobra, and away from MasTec. But those allegations never actually connect that scheme to PREPA's failure to reimburse MasTec's for its expenses. Any connection between the scheme and the failure to reimburse is pure speculation.  The Court agrees, then, with Cobra, that MasTec has failed to state a claim upon which it could recover its mobilization costs.

### (5) Claim for Violation of 31 L.P.R.A. § 5141

Finally, Cobra asks the Court to dismiss MasTec's claim under Puerto Rico statute 31 L.P.R.A. § 5141, arguing "MasTec does not specify any tortious act it purports to allege." (Cobra's Mot. at 23.) In opposition, MasTec says it "has alleged that Defendants engaged in a variety of wrongful acts which caused MasTec harm." (Pl.'s Resp. at 40.) MasTec also complains that "[t]o the extent Defendants contend that MasTec must tie its [§ 5141] claim to a pre-defined cause of action, they offer no support for that proposition." (*Id.* at 41.) Neither party's presentation is particularly helpful.

MasTec's point seems to be that, under § 5141, it can plead a claim for tortious conduct that does not necessarily fall within a pre-defined cause of action. In support, MasTec relies primarily on a combination of case law

---

[2] This is not to say that labeling a claim this way is proper—it is not. Indeed, "[i]f doing so would promote clarity, each claim founded on a separate transaction or occurrence . . . must be stated in a separate count." Fed. R. Civ. P. 10(b). But to dismiss MasTec's claim on this basis would be to ignore the allegations that the Court finds clearly support a claim for tortious interference with a business relationship.

describing § 5141 as having "broad pleading requirements," *e.g.*, *Cemex De Puerto Rico, Inc. v. Ductor, Inc.*, CIV.A. 09-2254 (GAG), 2010 WL 1727834, at *2 (D.P.R. Apr. 26, 2010), and language from the Restatement (Second) of Torts articulating the concept that "liability may be imposed although the actor's conduct does not come within a traditional category of tort liability," RESTATEMENT (SECOND) OF TORTS § 870 (1979). MasTec insists its allegations that the "Defendants colluded with Tribble to divert FEMA funds to Mammoth and Cobra and deprive MasTec of valuable restoration work after Hurricane Maria," are enough to state a claim under § 5141. (Pl.'s Resp. at 40.) The Court, however, finds these allegations virtually indistinguishable from the allegations supporting MasTec's tortious-interference claim. And MasTec does not explain why this conduct does not fall within the reach of an already recognized tort. Without more, the Court finds MasTec's generalized claim for relief under § 5141 akin to a plaintiff's presenting a claim that it identifies simply as an "intentional tort" without explaining to the Court why it cannot fashion relief under the rules of an already-established tort or statutory violation.

Lastly, the facts MasTec alleges to support its generalized claim under § 5141 in count four are not materially distinct from the facts it alleges to support its claim for tortious interference under count three. Accordingly, it appears the Court's choice-of-law analysis would result in the same finding that the contacts alleged establish a more significant relationship with Florida as compared with Puerto Rico. And since count four alleges a claim that would arise exclusively under Puerto Rico law, it should be dismissed for that reason as well. *See Carreras v. Pmg Collins, LLC*, 12-23150-CIV, 2013 WL 12094913, at *3 (S.D. Fla. Jan. 16, 2013) (Graham, J.) ("Since the substantive laws of Puerto Rico do not apply, and because [these counts] state claims exclusively under inapplicable Puerto Rico law, [these counts] are . . . dismissed.").

### B. Personal Jurisdiction Analysis

Issues relating to personal jurisdiction should ordinarily be addressed before considering the merits of a plaintiff's claims because a defendant is not bound by a court's ruling if it is not subject to the court's jurisdiction. *Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F. 3d 935, 940 (11th Cir. 1997). The Court departs from this general rule here, however, because the specific jurisdictional arguments raised by the Defendants hinge solely on whether MasTec has succeeded in stating a claim for relief against them. And under Florida law, when the basis for personal jurisdiction is the commission of a tort within the state, courts must first determine whether the complaint states a cause of action. *PVC Windoors, Inc. v. Babbitbay Beach Const., N.V.*, 598 F.3d 802, 808 (11th Cir. 2010). As set forth above, the Court finds that MasTec has

not stated a claim against Mammoth. And since the only basis MasTec alleges to support its claim for personal jurisdiction over Mammoth rests on the viability of those claims, the Court necessarily finds jurisdiction over Mammoth lacking. The Court therefore proceeds only to consider whether it has personal jurisdiction over Cobra.

Cobra, in turn, maintains there is no basis upon which to assert personal jurisdiction over it because MasTec has failed to "plead contacts of any kind between Cobra and Florida." (Cobra's Mot. at 19.) Because the Court finds MasTec has presented sufficient factual matter to state a claim for relief against Cobra for tortious interference with a business relationship, there is no merit to Cobra's argument.

Under Florida law, a Florida court may exercise personal jurisdiction over a nonresident defendant pursuant to a two-prong test: first, whether the plaintiff has alleged sufficient facts to satisfy the requirements of Florida's long-arm statute, Florida Statute § 48.193; and second, whether the plaintiff has demonstrated that defendant has sufficient "minimum contacts" with Florida to satisfy due process requirements. *Venetian Salami Co. v. Parthenais*, 554 So. 2d 499, 502 (Fla. 1989). Here, Cobra confines its objection to jurisdiction to its contention that MasTec faisd to plead facts showing that Cobra committed tortious acts in Florida and that, since MasTec has suffered a "mere economic injury," it cannot establish personal jurisdiction under Florida's long-arm statute. The Court is not persuaded.

As set forth in Florida's long-arm statute, personal jurisdiction may be exercised over a non-resident defendant "for any cause of action arising from" the commission of "a tortious act within this state." Fla. Stat. § 48.193(1)(a)2. Further, a "tortfeasor need not act within the state so long as the effect of the tort causes harm within the state." *XN Fin. Services, Inc. v. Conroy*, 12-80143-CIV, 2012 WL 12873512, at *4 (S.D. Fla. Mar. 5, 2012) (Dimitrouleas, J.) (citing *Posner v. Essex Ins. Co., Ltd.*, 178 F.3d 1209, 1216–17 (11th Cir. 1999)). And where a defendant "tortiously interferes with a business relationship outside of Florida that causes injury in Florida, the [defendant] is subject to personal jurisdiction under the Florida long-arm statute." *Elandia Intern., Inc. v. Ah Koy*, 690 F. Supp. 2d 1317, 1331 (S.D. Fla. 2010) (Moreno, J.) (adopting rep. & rec.).[3]

The parties do not dispute that MasTec sufficiently alleges it has suffered harm in Florida, where it is headquartered, as result of Cobra's tortious

---

[3] Cobra's reliance on *Baron v. Acasta Capital*, for the proposition that "mere economic injury" is insufficient to establish personal jurisdiction under Florida's long-arm statute misses the mark. CV 16-25118, 2017 WL 3084416, at *8 (S.D. Fla. July 19, 2017) (Scola, J.). The Court's analysis in that regard, in *Baron*, was with respect to subsection 6 of the long-arm statute. Here, in contrast, MasTec has established personal jurisdiction under subsection 2.

interference. (Cobra's Reply at 10 (noting, within the context of the choice-of-law inquiry, that "MasTec concedes that the place of injury is Florida") (citing Pl's Resp. at 32 ("[T]he Defendants' interference with MasTec's [contract] injured MasTec in Florida.") and 35 ("MasTec suffered losses primarily at its principal place of business.")).) Accordingly, and because Cobra does not raise any due process concerns, the Court finds Cobra has submitted itself to the jurisdiction of the courts of Florida.

### 4. Conclusion

For the reasons set forth above, the Court **grants** the remainder of Mammoth's motion to dismiss (**ECF 16**), dismissing MasTec's claims against Mammoth, without prejudice, based on a lack of jurisdiction. The Court **grants in part and denies in part** the remainder of Cobra's motion to dismiss (**ECF No. 17**) as follows: to the extent MasTec seeks to recover from Cobra through a claim for tortious interference with a contract or for its mobilization costs, those claims are dismissed, with prejudice, for a failure to state a claim under Rule 12(b)(6); Cobra's claim under Puerto Rico law, through 31 L.P.R.A. § 5141, is also dismissed, albeit without prejudice, because the Court finds that claim not recognized under Florida law; Cobra's motion to dismiss MasTec's claim for tortious interference with a business relationship for failure to state a claim and based on a lack of personal jurisdiction, however, is denied.[4]

Accordingly, the Court orders Cobra to answer the remaining claim in the complaint on or before **November 30, 2020**.

**Done and ordered**, at Miami, Florida, on November 18, 2020.

Robert N. Scola, Jr.
United States District Judge

---

[4] As the Court did in its prior order, dismissing MasTec's RICO claims (ECF No. 45), the Court denies MasTec's request for leave to amend, inserted as an afterthought, in a footnote, at the conclusion of its forty-page opposition to the Defendants' motions to dismiss: the request is both procedurally defective and lacking in substantive support. *See Newton v. Duke Energy Florida, LLC,* 895 F.3d 1270, 1277 (11th Cir. 2018) ("[W]here a request for leave to file an amended complaint simply is imbedded within an opposition memorandum, the issue has not been raised properly."); *Avena v. Imperial Salon & Spa, Inc.*, 740 Fed. App'x 679, 683 (11th Cir. 2018) ("[W]e've rejected the idea that a party can await a ruling on a motion to dismiss before filing a motion for leave to amend.") (noting also that "a motion for leave to amend should either set forth the substance of the proposed amendment or attach a copy of the proposed amendment") (cleaned up).